OPINION OF THE COURT
Chief Judge Cooke.
The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (UN Convention) was drafted to minimize the uncertainty of enforcing arbitration agreements and to avoid the vagaries of foreign law for international traders. This policy would be defeated by allowing a party, contrary to contract, to bring multiple suits and to obtain an order of attachment before arbitration. Therefore, the order of the Appellate Division should be reversed.
I
Plaintiff and others not here involved entered into a contract with defendant, a French corporation, to establish a New York corporation to distribute defendant’s products. The agreement provided that plaintiff and others could each tender his or her shares for repurchase to defendant or the New York corporation, the two being jointly and severally obligated to buy such shares according to a price-setting formula. Disputes over valuation were to be resolved by arbitration in Switzerland.
In April, 1978, plaintiff tendered his shares for repurchase. Negotiations ensued until defendant finally demanded arbitration. In September, 1978, plaintiff sought a permanent stay of arbitration in Supreme Court (Action I). Special Term denied the petition, but the Appellate Division reversed and issued a stay. The Court of Appeals, relying on Matter of United Nations Dev. Corp. v Norkin Plumbing Co. (45 NY2d 358), reversed and denied the stay in a one-sentence decision (49 NY2d 819).
During the pendency of Action I, in January, 1979, plaintiff commenced this action for a money judgment (Action II) and obtained an ex parte attachment of a debt owed by the New York corporation to defendant. Plaintiff *411 sought to confirm the attachment and was opposed by defendant, who moved to dismiss the complaint and vacate the attachment. Supreme Court confirmed the attachment after the Appellate Division had granted a stay of arbitration in Action I. Defendant renewed its motion to dismiss and vacate after the Court of Appeals reversed in Action I. Special Term granted the motion, relying on Federal cases that interpret the UN Convention as stripping a court of jurisdiction to entertain an attachment action. The Appellate Division reversed in a 4-1 decision, rejecting the loss-of-jurisdiction argument and holding that there could be prearbitration attachment. The dissenting Justice relied on Special Term’s decision.
II
Arbitration is preferred over litigation by the business world as “a process [that] combines finality of decision with speed, low expense, and flexibility in the selection of principles and mercantile customs to be used in solving a problem” (Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale LJ 1049; see Aksen, American Arbitration Accession Arrives in the Age of Aquarius: United States Implements United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 3 Sw U L Rev 1, 2-3). It has long been the policy in New York to encourage the use of arbitration “as an easy, expeditious and inexpensive method of settling disputes, and as tending to prevent litigation.” (Fudickar v Guardian Mut. Life Ins. Co., 62 NY 392, 399.) This support has not diminished over the last century (see Matter of Maye [Bluestein], 40 NY2d 113,117-118; 5 NY Jur 2d, Arbitration and Award, § 5, p 99).
The desirability of arbitration is enhanced in the context of international trade, where the complexity of litigation is often compounded by lack of familiarity with foreign procedures and law (see Burstein, Arbitration of International Commercial Disputes, 6 B C Ind & Comm L Rev 569, 569-572; Quigley, op. cit., at p 1051; see, also, Contini, International Commercial Arbitration, 8 Am J Comp L 283, 283-284; Domke, American Arbitral Awards: Enforcement in Foreign Countries, 1965 U of 111 L Forum 399). Thus, *412 resolving disputes through arbitration allows all parties to avoid unknown risks inherent in resorting to a foreign justice system.
The prevalent problem in international contracts containing arbitration clauses has been in enforcing the agreement to arbitrate. The old antagonism to arbitration (cf. Fudickar v Guardian Mut. Life Ins. Co., supra) is shared by many countries, so that there is often uncertainty whether a contracting party may be compelled to arbitrate or whether an arbitrator’s award may be enforced (see Burstein, op. cit., at pp 569-570; Contini, op. cit., at pp 287-288; Domke, op. cit.; McMahon, Implementation of the UN Convention on Foreign Arbitral Awards in the US, 26 Arb J 65, 65-66; Quigley, op. cit., at p 1057). Before 1958, international efforts to resolve these conflicts were made through bilateral and multilateral treaties (see Contini, op. cit., at pp 286-287). Of the latter, the most significant documents were the Geneva Protocol on Arbitration Clauses of 1923 and the Geneva Convention on the Execution of Foreign Arbitral Awards of 1927. Although helpful, the Geneva Treaties were not satisfactory as their language was ambiguous as to the scope of application, some awards were excluded from their scope, and the party seeking to enforce the award had the burden of proving the validity and finality of the award (see Contini, op. cit., at pp 288-289).
It was against this background that the UN Convention was drafted in New York in 1958. Generally, the UN Convention eased the difficulty in enforcing international arbitration agreements by minimizing uncertainties and shifting the burden of proof to the party opposing enforcement. The question whether an arbitral award is “foreign”, a matter unclear in some civil law countries (see Contini, op. cit., at pp 292-293), is answered by adopting a territorial definition of domesticity (see USCS Administrative Rules, Foreign Arbitral Awards Conv, art I, § 1; Contini, op. cit., at p 293). When an action is brought in court and a party asserts the arbitration agreement, the court “shall * * * refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.” (USCS Administrative Rules, *413 Foreign Arbitral Awards Conv, art II, § 3; see Contini, op. cit., at p 296). Moreover, foreign arbitration awards are to be enforced on the same terms as domestic awards (see USCS Administrative Rules, Foreign Arbitral Awards Conv, art III; Contini, op. cit., at p 297).
Of particular relevance to the present controversy are the UN Convention’s provisions for objecting to the award and requiring security. Unlike the earlier Geneva Treaties, the UN Convention requires the party opposing enforcement to prove the award’s invalidity, and it limits the grounds for objection (see USCS Administrative Rules, Foreign Arbitral Awards Conv, art V; Contini, op. cit., at p 299; see, also, Aksen, op. cit., at pp 11-12; Czyzak & Sullivan, American Arbitration Law and the UN Convention, 13 Arb J 197, 198-199; Domke, op. cit., at p 401; Quigley, op. cit., at p 1066). Moreover, if enforcement is opposed, the proponent of the award may request that the other party be ordered to give suitable security (see USCS Administrative Rules, Foreign Arbitral Awards Conv, art VI; Quigley, op. cit., at p 1060). This gives the courts a tool to discourage attempts to avoid arbitration awards which attempts are made merely as obstructionist tactics (see Contini, op. cit., at p 304).
Ill
The provisional remedy of attachment is, in part, a device to secure the payment of a money judgment (see McLaughlin, Practice Commentaries, McKinney’s Cons Law of NY, Book 7B, CPLR 6201:1, p 11). It is available only in an action for damages (see CPLR 6201; McLaughlin, op. cit.). Under the appropriate circumstances, it can be obtained in a matter that is subject to arbitration: an order of attachment will remain valid if it was obtained with notice or has been confirmed in a contract action before a defendant obtains a stay of proceedings because the underlying controversy is subject to arbitration (see American Reserve Ins. Co. v China Ins. Co., 297 NY 322, 326-327). It should be noted, however, that attachment would not be available in a proceeding to compel arbitration (see CPLR 7503, subd [a]), as that is not an action seeking a money judgment.
*414 It is open to dispute whether attachment is even necessary in the arbitration context. Arbitration, as part of the contracting process, is subject to the same implicit assumptions of good faith and honesty that permeate the entire relationship. Voluntary compliance with arbitral awards may be as high as 85% (see Contini, op. cit., at p 309, n 84). Moreover, parties are free to include security clauses (e.g., performance bonds or creating escrow accounts) in their agreements to arbitrate. The UN Convention apparently considered the problem and saw no need to provide for prearbitration security (cf. USCS Administrative Rules, Foreign Arbitral Awards Conv, Art VI [security available when party opposes enforcement of award]). Moreover, the list of signatory countries provides assurance to a contracting party that it will be able to enforce an arbitral award almost anywhere in the world (see id., at Appendix: List of Participants, Declarations and Reservations).
IV
More important here, however, is the injection of uncertainty — the antithesis of the UN Convention’s purpose — that would occur by permitting attachments and judicial proceedings. Once again, the foreign business entity would be subject to foreign laws with which it is unfamiliar.
The UN Convention was implemented in the United States in 1970 (Public L 91-368, codified at US Code, tit 9, § 201 et seq.). This act amended the Federal Arbitration Act by re-enacting the earlier sections and denominating them “Chapter 1”, and adding “Chapter 2” to provide a vehicle for enforcing the UN Convention (see Aksen, op. cit., at p 16). In McCreary Tire & Rubber Co. v CEAT (501 F2d 1032) the Third Circuit ruled that the language “refer the parties to arbitration” (USCS Administrative Rules, Foreign Arbitral Awards Conv, art II, § 3) precludes the courts from acting in any capacity except to order arbitration, and therefore an order of attachment could not be issued. To hold .otherwise would defeat the purpose of the UN Convention (see id.; accord I.T.A.D. Assoc. v Podar Bros., 636 F2d 75 [4th Cir]; Metropolitan World Tanker Corp. v P.N. Pertambangan Minjakdangas Bumi Nasional, 427 F Supp 2 [SDNY]; see, also, Siderius, Inc. v Compania de Acero del Pacifico, S.A., 453 F Supp 22 [SDNY]).
*415 Plaintiff relies on a number of cases to the contrary (see Paramount Carriers Corp. v Cook Inds., 465 F Supp 599 [SDNY]; Compania de Navegacion y Financiera Bosnia, S.A. v National Unity Mar. Salvage Corp., 457 F Supp 1013 [SDNY]; Atlas Chartering Servs. v World Trade Group, 453 F Supp 861 [SDNY]; Carolina Power & Light Co. v Uranex, 451 F Supp 1044 [ND Cal]). Most of these cases are distinguishable, however. The implementing statute provides that normal Federal arbitration law applies to the extent it is not inconsistent with the UN Convention (see US Code, tit 9, § 208). That law specifically permits attachment to be used in admiralty cases (see US Code, tit 9, § 8). In all of the cases relied on by plaintiff, except for National Unity Mar. and Carolina Power, the courts relied on section 8 in approving attachment in a case arising out of a maritime contract. In National Unity Mar., the court discussed neither section 8 nor the UN Convention in approving attachment in a maritime contract case. Only in Carolina Power did the court allow attachment in a case not involving a maritime contract falling under the UN Convention. That court rejected McCreary’s reasoning that it must divest itself of jurisdiction. Instead, concerned that the plaintiff would be unable to enforce an eventual arbitral award, the District Court approved the security attachment, a rationale that, as discussed above, is not compelling.
The controversy now before this court demonstrates the soundness of the decisions reached by the Third and Fourth Circuits. Defendant agreed to arbitrate disputes, but instead has become embroiled in two lawsuits. Action II, the instant case, is nothing more than plaintiff’s attempt to circumvent Special Term’s ruling in Action I denying the stay of arbitration. Indeed, the chronology of events indicates that the order of attachment should never have issued at all, as the underlying dispute is subject to arbitration.
V
Whenever a matter of foreign relations is involved, one must consider the mirror image of a particular situation. Is it desirable to subject American property overseas to whatever rules of attachment and other judicial process may apply in some foreign country when our citizen has agreed *416 to arbitrate a dispute? It can be assumed that American business entities engaging in international trade would not encourage such a result. Permitting this type of attachment to stand would expose American business to that, risk in other countries.
The essence of arbitration is resolving disputes without the interference of the judicial process and its strictures. When international trade is involved, this essence is enhanced by the desire to avoid unfamiliar foreign law. The UN Convention has considered the problems and created a solution, one that does not contemplate significant judicial intervention until after an arbitral award is made. The purpose and policy of the UN Convention will be best carried out by restricting prearbitration judicial action to determining whether arbitration should be compelled.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the order of Supreme Court, New York County, reinstated.