**JAB INDUSTRIES, INC., Plaintiff,**

v.

**SILEX S.P.A. and Tito Bentivogli, Defendants.**

**No. 84 Civ. 2639–CSH.**

United States District Court, S.D. New York.

Feb. 4, 1985.

Bloch, Graff, Danzig, Jelline & Mandel, New York City, for plaintiff; Howard Graff, Elaine Menlow, Sheryl L. Krongold, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendants; Joseph A. Kilbourn, Peter Broeman, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This case is before the Court on cross-motions to compel or stay arbitration, and for related relief.

### I.

Plaintiff Jab Industries, Inc. ("Jab"), a New York corporation, is an importer and distributor of household items. Defendant Silex S.P.A. ("Silex"), an Italian corporation, manufactures portable oil-filled electric heaters. Defendant Tito Bentivogli is president of Silex.

On May 16, 1981 Jab and Silex entered into a written agreement by which Silex appointed Jab to be the exclusive distributor of its heaters in the United States and Canada. The agreement calls for Jab to purchase Silex's heaters for its own account, ¶ 2, paying for them through irrevocable letters of credit payable 90 days from the date of presentation of shipping documents. ¶ 5.

Paragraph 18 provides for arbitration. It reads:

"In the event of any dispute arising hereunder or in connection herewith, the same shall be submitted to binding arbitration in the City of New York, New York before three (3) arbitrators in accordance with the rules of the American Arbitration Association. Each party hereto consents to the jurisdiction of such Association and agrees to be bound by the award of such tribunal. Nothing in this Paragraph, however, shall limit the ability of any party to this Agreement from seeking from a court of competent jurisdiction, any provisional remedy, including but not limited to injunction, receivership or attachment in the event of a dispute arising hereunder or in connection herewith."

Thereafter Jab and Silex entered into three supplemental agreements. The first is dated February 22, 1982. It is captioned "Supplemental Agreement." Its preface recites that it "supplements the Distributorship Agreement dated May 16, 1981" between Silex and Jab. Paragraph 1 of this supplemental agreement recited Jab's delivery to Silex, and Silex's receipt, of three checks in payment of three designated invoices, as well as the delivery by Jab

to Silex of "accepted drafts" payable "at 90 days from the due date" of three additional specified invoices.

Paragraph 2 of the supplemental agreement of February 22, 1982 provides as follows:

"The Distributor will accept drafts in a form substantially [sic] the same as that annexed hereto as Exhibit 'A' for amounts of each invoice which remains unpaid, the drafts to be payable at 90 days from the due date of each invoice and to be mailed by registered mail, return receipt requested, to the Company before the due date of each invoice. At the request of the Distributor the due date of each draft referred to in this paragraph or in paragraph 1 above, shall be extended for additional 30 day periods up to a maximum of 90 days."

The form of draft attached as Exhibit "A" to this agreement is printed in Italian. It contains a handwritten notation incorporating by reference the supplemental agreement of February 22, 1982 between Silex and Jab.

The second supplemental agreement is dated August 12, 1982. Its preamble recites that the agreement "supplements the distributorship agreement" between Silex and Jab. The agreement sets forth details of further purchases and shipments. In respect of payment, this supplemental agreement provides:

"2. Delivery and payment of the above-mentioned units will be effected as follows:

"a. The first 25,000 units will be shipped against receipt of irrevocable Letters of Credit payable 90 days from the date of shipment according to the shipping documents. Shipping documents to be those documents that indicate the day the boat has left the port of Europe to be called hereafter Bill of Lading. The Letters of Credit must include the following statements "Irrevocable Letter of Credit to be confirmed by advising Italian Bank (name of bank) with draft drawn on (name of Italian bank).

"b. The following 15,000 units will be shipped immediately after the first 25,000 units are shipped and will be paid against drafts accepted by the Distributor payable 90 days from the date of the Bill of Lading. The drafts will be accepted and delivered to the Company or to one designated by the Company upon receipt of the invoice which will be made the day before the goods leave the Company's premises."

A third supplemental agreement, so captioned, was entered into on October 28, 1982. Its preamble recites that it is "supplemental to and is an integral part of the distributorship agreement (the "Distributorship Agreement") dated May 16, 1981" between Silex and Jab. Further commercial details are given. Certain units covered by this supplemental agreement were to be paid for by letters of credit. This agreement then provides at ¶ 3(e):

"(e) Notwithstanding the provisions of subparagraphs (c) and (d) above, after Silex has shipped 15,000 units covered by containers 55 through 73, and after Silex has received letters of credit in acceptable form in payment therefor, Silex will ship four containers containing an aggregate of approximately 3,520 units on open account, the title documents of which will be released to Jab against acceptance and delivery by Jab to Silex of drafts payable at 90 days from the date of shipment of the units from Italian port, such drafts to be in the same form as used in the past."

The drafts submitted pursuant to the second and third of these three supplemental agreements were not required to include notations incorporating the agreements by reference.

It is not at all clear from the motion papers which party took the initiative in amending the methods of payment under the distribution agreement. What is clear is that, increasingly over time, "notes" or "drafts" (the parties use the terms interchangeably) replaced letters of credit against shipping documents as the method of payment. It does not matter which par-

ty suggested the change, because whichever it was, the other party acquiesced.

When the draft procedure of payment was followed, Silex's procedure was to invoice Jab and send with the invoice a draft which had not yet been signed by Silex as the drawer. Jab accepted the draft by signing it and returning it to Silex. Silex then signed the draft as drawer and presented it to an Italian bank.

Disputes arose under the distribution agreement. I need not detail them here. It is sufficient to say that at present, some 20,000 heaters purchased by Jab from Silex are presently languishing in warehouses in New Jersey. Jab says that most of them suffer from defective manufacture. Silex says that if the heaters are defective, the condition resulted from damage during ocean shipment, with the risk falling on Jab since the shipments were F.O.B. These significant disputes as to quality and merchantability are reflected on the payment side of the distributorship agreement. Jab has refused to accept certain drafts forwarded by Silex, and, although accepting others, has refused payment on them.

The situation is further complicated by the fact that Silex negotiated or assigned a number of accepted drafts to Italian banks. The best present estimate is that fourteen drafts totalling $370,700.15 are in the possession of Italian banks. Silex holds original drafts totalling $827,264.48. Jab refuses to pay any of them. Predictably, the banks take the position that they are not concerned with the disputes between Jab and Silex. The banks look to Jab to pay the drafts, or notes, which they hold. One bank has commenced an action on its drafts against Jab in this court. *Banca di Credito Agrario di Ferrara v. Jab Industries Inc.*, 84 Civ. 8996 (MP). That case is presently pending before Judge Pollock.

Jab's counsel takes the position that the *Banca di Credito* case should be transferred to my docket as related to the captioned action. Counsel for the bank resists that suggestion. I address the issue *infra*.

On March 30, 1984 Silex sent Jab a written notice of termination of the distributor-ship agreement, in the event that Jab did not satisfy its perceived debt of $1,178,396 to Silex on or before May 8, 1984. On April 13, 1984 Jab commenced the captioned action against Silex, alleging antitrust and Lanham Act violations. The case first came before the Court on Jab's motion for preliminary injunctive relief in respect of unfair competition involving Jab's trade dress. The Court granted Jab injunctive relief. Oral opinion of May 4, 1984. It is not necessary, within the context of the present motions, to dwell further upon those events.

On June 1, 1984 Silex filed with the American Arbitration Association a demand for arbitration of the disputes between Silex and Jab arising under the distribution agreement. The demand for arbitration states as follows:

"NATURE OF DISPUTE: Pursuant to a Distributorship Agreement and Supplemental Agreements thereof, Jab Industries, Inc. purchased heaters from claimant Silex, S.p.A. for which Jab has not paid.

"Payment was to be by drafts drawn on Jab by Silex. In some cases Jab accepted drafts but later refused to honor them. In other cases Jab has refused to accept the drafts. In a few instances Jab gave checks in exchange for some of the drafts but then stopped payment on the checks.

"Jab agreed on March 1, 1984 to pay the amount in dispute by March 20, 1984. On April 13, 1984, still not having paid its debt to Silex, Jab commenced an action in federal court against Silex and its Sole Director, Tito Bentivogli, for infringement, unfair competition and related matters, all pertaining to the Distributorship Agreement. A copy of the complaint filed by Jab is attached hereto as Exhibit B.

"CLAIM OR RELIEF SOUGHT: (amount, if any) Payment of $1,178,396 in satisfaction of the mentioned debt and dismissal of the claims alleged in the above-mentioned lawsuit."

It is this arbitration which, on these cross-motions, Jab seeks to stay and Silex seeks to compel. The motions are governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–4.

## II.

"Since adoption of the United States Arbitration Act, American jurisprudence has favored the arbitrability of disputes whenever parties contractually provide for arbitration." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir.1983), citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974).

■ In the case at bar, ¶ 18 of the distributorship agreement provides for the arbitration of "any dispute arising hereunder or in connection herewith...." I regard this clause as broad in scope. Even if it should be regarded as "narrow," *cf. Prudential Lines, Inc., supra*, at 64 n. 5, disputes involving the quality of the heaters furnished by Silex and Jab's obligation to pay for them clearly fall within the arbitration clause.

That being so, and given the public policy favoring arbitration as expressed in the statute, Jab bears a heavy burden of persuasion in avoiding the arbitration demanded by Silex.

Jab argues that Silex's only enforceable claim arises under the notes (or drafts), and not under the distributorship agreement. Because the notes do not contain arbitration clauses, Jab contends that it is under no obligation to arbitrate with Silex. References are made to the Uniform Commercial Code and New York state decisions interpreting its provisions in respect of the nature, functioning and effect of notes or drafts as instruments of payment.

■ I find no substance to Jab's argument. I readily accept Jab's preliminary proposition: that the obligation of a party to a commercial transaction to arbitrate disputes is contractual in nature, so that it cannot be compelled to arbitrate in the absence of an agreement to do so. In the case at bar, however, the distributorship agreement, which underlies the present disputes, contains an arbitration clause. What I cannot accept is Jab's contention that after-occurring events displaced the arbitration agreement with different contracts.

■ In considering the impact of the drafts upon the distributorship agreement and its arbitration clause, I look first to the three supplemental agreements. It is these agreements which introduced drafts or notes as an alternative to payment by letter of credit. The adjective "supplemental" is significant. The distributorship agreement was not being revoked or displaced, it was being supplemented in certain limited ways. Except to the extent of those limited changes set forth in the supplemental agreements, the original distributorship agreement (including its arbitration clause) remained in full force and effect.

Surely there was no express revocation of the arbitration clause. Jab's argument has to be that the arbitration clause in the distributorship agreement was impliedly revoked by the substitution of drafts as a means of payment for letters of credit. In view of the public policy favoring arbitration, as well as applying basic contract principles, I decline to find such an implication.

It is clear that if the distributorship agreement had originally provided for payment by time drafts, Jab could not avoid arbitration on the theory that whereas the agreement provided for arbitration, the drafts did not. Judge Lasker so held in *Dale Metals Corp. v. Kiwa Chemical Industry Co.*, 442 F.Supp. 78, 81 n. 1 (S.D.N.Y.1977):

"In support of their motion to remand, plaintiffs advance the unusual contention that the time drafts by which payment for the Kiwalite was made supersede the confirmations of sale. The latter contain arbitration clauses. The former do not. Since removal was based on the existence of the arbitration agreement, 9 U.S.C. § 205, the alleged disappearance

of the agreement is said to compel remand. Plaintiffs offer no authority for the proposition that an instrument of payment supersedes the underlying agreement that gives rise to the obligation to pay. If this were true, every ordinary check issued to pay for, say, a bargained-for sale of goods would dissolve the underlying contract."

It makes no difference that, in the case at bar, the contract originally provided for payment by letters of credit, with payment by time drafts being introduced by a series of supplemental agreements. The essence of Judge Lasker's opinion—with which I fully agree—is that procedures for payment cannot be viewed in isolation, so as to eliminate by implication a clearly expressed agreement to arbitrate contained in the underlying agreement which the drafts are intended to implement. At the very least, the circumstances would require a clearly expressed intent to revoke the arbitration clause. None appears here.

The arbitration case upon which Jab places primary reliance (as opposed to cases arising generally out of the UCC) is *Matter of ITT Avis, Inc. v. Tuttle,* 27 N.Y.2d 571, 313 N.Y.S.2d 394, 261 N.E.2d 395 (1970). The case is inapposite. In *Tuttle,* two separate contracts existed: an employment agreement, and a stock option agreement. An employee sought arbitration of a claim arising under the separate stock option agreement. The memorandum of the 4–3 majority reads:

> "The arbitration clause contained in the employment contract provided: 'Any controversy concerning *a question of fact arising* under this agreement shall be determined by arbitration in accordance with the rules then in effect of the AMERICAN ARBITRATION ASSOCIATION.' (Emphasis added.)
>
> "While it is true that the employment contract makes mention of the stock option plan, there is absolutely no indication in the employment agreement that the parties ever contemplated arbitrating the disputes which might arise under the separate stock option agreement. Accordingly, in the absence of an arbitra-

tion clause in the option agreement itself, or some clear statement incorporating the arbitration clause contained in the employment contract, it is simply impossible to read these separate agreements as one to find the requisite intention to arbitrate the dispute which has arisen under the option agreement (*Matter of Lehman v. Ostrovsky,* 264 N.Y. 130, 190 N.E. 208). To hold otherwise, would, in our opinion, lead the parties into arbitration 'unwittingly through subtlety' (*Matter of Riverdale Fabrics Corp. [Tillinghast-Stiles Co.],* 306 N.Y. 288, 291, 118 N.E.2d 104, 106)."

313 N.Y.S.2d at 394–95, 261 N.E.2d 395.

This case is not in the least instructive in the case at bar, where the parties' rights and obligations turn upon a single, underlying commercial contract, implemented by alternating methods of payment.

There is Second Circuit authority for the proposition that "[i]f a dispute arises under a collateral agreement, arbitration of that dispute cannot be compelled merely based upon the existence of an arbitration clause in the main agreement." *Prudential Lines, Inc., supra,* at 64, citing *Rochdale Village, Inc. v. Public Services Employees Union, Local No. 80,* 605 F.2d 1290, 1296–97 (2d Cir.1979). However, the crucial distinction lies "between a dispute arising under a collateral agreement and one which arises under the main agreement but requires determination of a sub-issue." *Ibid.* A "sub-issue," under Second Circuit authority, is one which is "inextricably tied up with the merits of the underlying dispute," *McAllister Bros. v. A & S Transportation Co.,* 621 F.2d 519, 523 (2d Cir.1980). In the case at bar, there is no basis for arguing that the drafts by which the underlying indebtedness was to be paid constitute "collateral agreements." On the contrary, Silex's right :to collect on those drafts, as well as Jab's right to reject or dishonor them, is "inextricably tied up with the merits of the underlying dispute." Consequently the disputes are arbitrable under the Second Circuit cases cited.

The very fact that, in a significant number of instances, Jab has either refused to accept the drafts or dishonored those previously accepted, casts into bold relief the insubstantiality of Jab's effort to avoid arbitration. I am advised by counsel for Silex, and have no reason to doubt, that Jab refused to accept drafts in a total amount of $402,568.30. Silex main brief at 12. In addition, it is common ground that Jab has dishonored drafts which it previously accepted. This comprises the second element of the indebtedness Silex now asserts against Jab in arbitration. The third element arises out of checks which Jab gave in exchange for some of the drafts, thereafter stopping payment on the checks. See Silex's demand for arbitration, quoted at p. 975, *supra.* While Jab professes to rely upon the Uniform Commercial Code, the most pertinent provision is section 3–802(1), whose provisions, set out in the margin,[1] demonstrate that the giving of the sort of instrument involved in this case suspends the underlying indebtedness only *pro tanto* until the instrument is honored and paid. "If the instrument is dishonored action may be maintained on either the instrument or the obligation," § 3–802(1)(b); Silex pursues the former course in arbitration, and in these circumstances, Jab is hardly in a position to complain of it.

## II.

Alternatively, Jab argues that Silex has by its conduct waived the arbitration clause.

It is true in principle that a party may through his conduct waive his right to arbitration. In practice, the question turns upon the circumstances of each case, subject to the overarching federal policy favoring arbitration, which requires that "waiver is not to be lightly inferred." *Lubrizol*

*International, S.A. v. M/V Stolt Argobay,* 562 F.Supp. 565, 572 (S.D.N.Y.1982), and cases there cited.

There is no substance to the claim that Silex waived its right to arbitrate disputes under the distributorship agreement. Much of the analysis under Point I, *supra,* applies here. I will only add to that discussion a consideration of Jab's claim that waiver should be based upon the prejudice to Jab arising out of Silex's negotiation of some of the drafts into the hands of third-party banks.

The short answer is that Jab is in no position to complain of those events. Whether Jab initiated the substitution of drafts for letters of credit or readily acquiesced in that manner of payment, the negotiation by Silex of at least a portion of the notes was easily foreseeable, if not in the circumstances highly likely. It is true that the third-party banks are not bound by the arbitration clause, and can accordingly pursue Jab independently. But that is not a sufficient reason to deprive Silex of the benefit of its contracted-for arbitration clause, particularly since the drafts themselves could readily have been claused to revoke the arbitration clause in respect of shipments covered by them.

I decline to hold, in the circumstances of this case, that Silex waived arbitration.

## III.

Jab has included an antitrust claim against Silex in its complaint in this Court. It is that Silex's negotiation of the notes, the filing of an arbitration claim, and refusal to refund to Jab the "tremendous sum" allegedly due Jab for defective heaters "are simply part and parcel of the conspiracy to eliminate the plaintiff from the Heater business." Main brief at 18. On

---

1. The section provides:
    "(1) Unless otherwise agreed where an instrument is taken for an underlying obligation
    "(a) the obligation is pro tanto discharged if a bank is drawer, maker or acceptor of the instrument and there is no recourse on the instrument against the underlying obligor; and

    "(b) in any other case the obligation is suspended pro tanto until the instrument is due or if it is payable on demand until its presentment. If the instrument is dishonored action may be maintained on either the instrument or the obligation; discharge of the underlying obligor on the instrument also discharges him on the obligation."

the basis of that claim, Jab argues that the arbitration should be stayed in order to preserve this Court's exclusive jurisdiction over that nonarbitrable federal claim.

■ The rule in this Circuit is that the existence of an antitrust issue, which must be decided by the Court and is nonarbitrable, does not necessarily require that arbitration of arbitrable issues be stayed pending its court resolution. To justify a stay of arbitration, it must appear that the antitrust issues "permeate the entire case," have "a reasonable chance of success," and "may conclude the entire matter...." *N.V. Maatschappij voor Industriele Waarden v. A.O. Smith Corp.*, 532 F.2d 874, 876 (2d Cir.1976) and cases cited. Ordinarily this requires "a showing *prima facie* of an agreement in restraint of trade." *Ring v. Spina*, 148 F.2d 647, 654 (2d Cir.1945). Arbitration pending a decision by the court on the antitrust claim will not be ordered "where the validity of the antitrust claims was not so clear," or where it is not that clear that the antitrust decision will conclude the entire case, as where the agreement in suit contains a severability clause. *N.V. Maatschappij, supra,* at 876–77, and cases there cited.

■ In the case at bar, while I intimate no view on the merits of Jab's antitrust claim, it can hardly be said that at the pleading stage it rises to the level of a *prima facie* showing of an antitrust violation. Furthermore, assuming the viability of the antitrust claim, the contract at bar contains a severability clause. Nor does the antitrust issue "permeate the entire case." Whether or not Silex's heaters were in fact defective is a commercial question, uncomplicated by antitrust considerations. I could conclude otherwise only if I accepted at face value Jab's contention of massive defects. But that is a contention, not proof; Silex denies it; the issue is arbitrable; and the arbitrators will resolve it.

The assertion of this particular antitrust claim in this particular case does not entitle Jab to a stay of arbitration. On the contrary: I will stay the litigation here pending arbitration, with its likely narrowing of the issues. *Cf. Fox v. Merrill, Lynch Co., Inc.*, 453 F.Supp. 561 (S.D.N.Y.1978).

## IV.

Finally, Jab fashions a claim for "equitable relief," as follows: a stay of the arbitration unless defendants are able to produce all of the notes; or alternatively, that the arbitration be stayed until defendants post a bond to ensure Jab's right of contribution against defendants in case Jab is held liable to the third-party banks, but prevails in the arbitration. Those were the demands accompanying Jab's original motion. In a subsequently filed memorandum, Jab asks that arbitration proceedings be stayed pending extensive document discovery and depositions.

■ I reject these applications. Silex may well be unable to produce the notes which it negotiated to third-party banks. Consequently a stay of arbitration pending their production would effectively deprive Silex of a right to arbitrate which is enforceable in the circumstances of this case. Nor will I require defendants to post a bond. Nothing in the Arbitration Act provides for such a requirement; indeed, there is no provision in the statute for a stay at all, although in appropriate circumstances such an order is within the discretionary power of the district court. See generally, *Tai Ping Insurance Co. Ltd. v. M/V Warschau*, 731 F.2d 1141, 1144 (5th Cir.1984). Generally, with the exception of maritime cases, provisional remedies such as attachments or compulsory bonds are not available in arbitration. *Cooper v. Ateliers de la Motobecane*, 57 N.Y.2d 408, 456 N.Y.S.2d 728, 442 N.E.2d 1239 (1982). I will not require security at this late date, where the negotiation by Silex of the drafts was readily foreseeable, and Jab could have taken steps to protect itself, had it wished, when drafts were first suggested as an alternative to payment under the contract by letters of credit.

Silex has offered to consent to an order requiring that if Silex succeeds in its arbi-

tration against Jab, $370,700.15 [2] of the amount recovered be used to satisfy drafts held by the third-party banks or, alternatively, deposited with the Court, provided that the arbitration includes that portion of the debt represented by the drafts held by the banks. This procedure is suggested as a means of ensuring Jab against possible double liability. Affidavit of Peter Broeman, Esq., verified January 9, 1985, at ¶ 31. That is the most consideration to which Jab is entitled in the circumstances. The order adjudicating these motions will contain that requirement.

As for discovery, the rules of the AAA, by which the parties agreed to be bound, contain limited discovery procedures. I will adhere to the usual rule that broad form discovery under the Federal Rules of Civil Procedure is not available to parties who have agreed to arbitrate their disputes.

### V.

The last issue is whether the *Banca di Credito* case presently pending before Judge Pollack should be transferred to me as a "related case."

Rule 15 of the Rules for the Division of Business Among District Judges of this Court defines "related cases" as follows:

"Cases are related if they present common questions of law and fact, or arise from the same source or substantially similar transactions, happenings, events or relationships, or if for any other reason they would entail substantial duplication of labor if assigned to different judges."

In view of the resolution of the present motions, litigation in this case will be stayed and arbitration will go forward between Jab and Silex. The plaintiff bank in *Banca di Credito* is not bound by the Jab/Silex arbitration clause. Nevertheless, an argument can be made for staying the bank's action against Jab pending the arbitration. In certain circumstances "a stay is

appropriate even though it affects parties who are not bound to arbitrate." *Dale Metals Corp., supra,* at 81, citing *Lawson Fabrics, Inc. v. Akzona, Incorporated,* 355 F.Supp. 1146, 1151 (S.D.N.Y.), *aff'd.,* 486 F.2d 1394 (2d Cir.1973).

Whether or not such a stay should issue lies within the sound discretion of the trial judge. At the very least, Judge Pollack's judicial discretion is as perceptive as mine. I therefore see no need to treat the cases as related, although I will consult Judge Pollack on the point.

### CONCLUSION

For the foregoing reasons, these motions are resolved as follows:

1. Plaintiff's motion to stay arbitration and for related relief is denied.

2. Defendants' cross-motion to compel arbitration is granted. This litigation is stayed pending arbitration.

3. In the event that defendants prevail in the arbitration in respect of shipments covered by drafts negotiated to third-party banks, payment of that portion of the arbitration award will be made by Jab not to defendants, but to defendants' counsel, who are hereby directed to pay such amount forthwith into the Registry of this Court, there to await the Court's further order. In further implementation of this paragraph, counsel for the parties are directed to submit a copy of this order to the arbitrators, and to request the arbitrators to issue an itemized award.

4. This Court will retain jurisdiction over plaintiff's antitrust claim, and over such further proceedings as may arise under the Federal Arbitration Act or this order.

The Clerk of the Court is directed to place this case on the Suspense Docket of the Court.

It is SO ORDERED.

---

**2.** That is the amount Silex calculates to represent the total of negotiated drafts in the hands of banks. Counsel for defendants have submitted detailed affidavits in support of that calculation. No reason is suggested why I should distrust it.