**ALVENUS SHIPPING CO., LTD. Plaintiff,**

v.

**DELTA PETROLEUM (U.S.A.) LTD., Flota Petrolera Ecuatoriana, Halley, Calkins & Avallone, P.C. and Fleet National Bank, Defendants.**

**FLOTA PETROLEUM ECUATORIANA, Plaintiff,**

v.

**DELTA PETROLEUM (U.S.A.) LTD., Alvenus Shipping Co., Ltd., and Fleet National Bank, Defendants.**

Nos. 93 Civ. 5535 (JFK), 93 Civ. 5878 (JFK).

United States District Court, S.D. New York.

Feb. 23, 1994.

Rajnikant Daulatrao Jadhav, Chalos, English & Brown, P.C., New York City, for Flota Petrolera Ecuatoriana.

Louis P. Sheinbaum, Waesche, Sheinbaum & O'Regan, P.C., New York City, for Alvenus Shipping Co., Ltd.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRESKA, District Judge.

1. Plaintiff, Alvenus Shipping Co. Ltd. ("Alvenus"), is a foreign corporation organized under the laws of England and Wales, with its principal place of business in London. (Statement of Antony Stewart Crawford In Support Of Motion For Provisional Remedy, dated August 8, 1993, hereinafter referred to as the "Crawford Statement," at ¶ 3.)

2. Defendant Delta Petroleum (U.S.A.) Ltd. ("Delta") is a New York corporation with an office and principal place of business in New York. (Statement of Spiros S. Milonas In Opposition to Motion For Provisional Remedy, dated August 27, 1993, at ¶ 1.)

3. Defendant Halley, Calkins & Avallone, P.C. (the "Law Firm"), is a New York law firm. The Law Firm represents defendant Flota Petrolera Ecuatoriana ("Flopec"), an agency of the Government of Ecuador engaged in the oil business. Defendant Fleet National Bank ("Fleet Bank") is a bank with offices or branches in New York.

4. Alvenus chartered the M/T HALIFAX to Delta pursuant to a charter party contract dated November 30, 1990, at New York, New York (the "Head Charter"). (Crawford Statement, ¶ 5; Affidavit of Louis P. Sheinbaum In Support Of Motion For Injunction Or Attachment, sworn to on August 9, 1993, hereinafter the "Sheinbaum 8/9/93 Aff." at ¶ 3.)

5. Delta subchartered the M/T HALIFAX to Flopec pursuant to a charter party contract dated April 30, 1990 (the "Subcharter"). On August 30, 1991, the M/T WHITE SEA was substituted for the M/T HALIFAX in both charter parties. (Crawford Statement, at ¶ 6.)

6. Charter party disputes arose between Flopec and Delta under the Subcharter and between Delta and Alvenus under the Head Charter. Pursuant to a submission agreement dated September 22, 1992, Flopec and Delta arbitrated their disputes in New York (the "Flopec Arbitration"). (Crawford Statement, at ¶ 7, Exh. 1.) On July 9, 1993, the arbitrators rendered an award in the Flopec Arbitration granting Delta damages in the amount of $407,737.40. (Crawford Statement, at ¶ 4, Exh. 2.) The Law Firm represented Flopec in that arbitration and currently holds in its escrow account with Fleet Bank $407,737.40 received from Flopec to pay the Flopec Arbitration award (the "Funds"). (Crawford Statement, at ¶ 8; see Opposing affidavit of Tulio R. Prieto, Esq., sworn to on August 30, 1993 ("Prieto Aff."), Exh. C.) The Funds constitute the proceeds of the award in the Flopec Arbitration in favor of Delta (see Prieto Aff., Exh. C).

7. On or about September 28, 1992, Delta returned the WHITE SEA to Alvenus. Alvenus protested the redelivery as being premature (Crawford Statement, Exh. 3) and sent a telex to Delta on September 29, 1992, which outlined certain amounts allegedly owed to Alvenus as of that time. (Crawford Statement, Exh. 4.) The telex and calculation included, *inter alia*, Alvenus' perfor-

mance claim for the first year of the Head Charter for approximately $150,000; a claim for $70,990.77 for additional pollution insurance premiums paid by Alvenus; and noted that a performance claim would be added later for the second year of the Head Charter. (Crawford Statement, Exh. 4.)

8. Delta responded to the claims by referring Alvenus to the then-pending Flopec arbitration. (Crawford Statement, Exh. 5.) Delta advised Alvenus that it intended to include Alvenus' outstanding claims in that proceeding. Delta further advised Alvenus that, if the claims were valid, Delta saw "no reason for [Alvenus] not to be reimbursed," and requested that the documents for the insurance premium claim and second year performance claim be immediately forwarded to New York. (*Id.*)

9. On August 8, 1992, Alvenus demanded arbitration against Delta in London (the "London Arbitration"), named its arbitrator, and called upon Delta to name its arbitrator in accordance with the Head Charter. (Crawford Statement, ¶ 10, Exh. 6.) It appears that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") is applicable to the London Arbitration. *See* 9 U.S.C. § 201 (West Supp.1993). Prior to the commencement of this action in August of 1993, Delta had not responded to Alvenus' demand, designated an arbitrator or taken any other step with respect to the London Arbitration (Crawford Statement, ¶ 10).

10. On October 12, 1992, *i.e.,* four days after receiving Alvenus' first arbitration demand, Mr. Milonas of Delta telephoned Mr. Crawford of Alvenus. Although several of the statements allegedly made in that call are disputed, Mr. Crawford asserts Mr. Milonas said that the only source of money to pay the claims of Alvenus was the money to be recovered in the Flopec Arbitration. (Crawford Statement, at ¶ 11.) Delta does not deny that statement.

11. Several of the claims on which Delta recovered in the Flopec Arbitration arise out of or are the same claims as Alvenus' claims against Delta in this action and the London Arbitration. For example, on October 13, 1992, Delta telexed Alvenus requesting additional documents "supporting OPA [Oil Pollution Act of 1990] additional premium for U.S. calls as well as the performance you claim for the second year." (*Crawford Statement*, at ¶ 12, Exh. 7.) Alvenus thereafter complied and sent Delta its documents in support of its performance claim and the insurance claim in the amount of $70,990.77. . (Crawford Statement, at ¶ 13.)

12. Alvenus presented the insurance claim to Delta in the amount of $70,990.77, and Delta submitted the exact claim in the exact amount and recovered the exact amount against Flopec in the Flopec Arbitration. (Crawford Statement, at ¶ 13, Exhs. 8 and 9.) That same claim is contained in the present complaint and in the London Arbitration. *See* Complaint in 93 Civ. 5535 ("Complaint") at ¶¶ 14, 18; Sheinbaum 8/9/93 Aff. ¶ 6, Exh. 3.

13. The performance claim was a claim for a bonus allegedly due Alvenus under the Head Charter for exceeding the performance provisions of the Head Charter. (Crawford Statement, at ¶ 13.) Alvenus submitted a performance claim of approximately $230,000 and supporting documents to Delta, and Delta passed Alvenus' calculations and documents for the performance claim to Flopec in the Flopec Arbitration. (Crawford Statement, Exh. 13; *see* Sheinbaum 8/9/93 Aff. at ¶ 7; *see also* Reply Affidavit of Louis P. Sheinbaum, sworn to on September 8, 1993 (hereinafter "Sheinbaum 9/8/93 Aff.", ¶¶ 6 and 7).) Flopec and Delta compromised the claim and stipulated its value to be $198,643, and this amount was awarded by the arbitrators in the Flopec Arbitration. (Crawford Statement, ¶ 13, Exh. 8 and Exh. 2, at 3; Sheinbaum 9/8/93 Aff. at ¶ 7 n. 1.) That same performance claim is included in the Complaint and in the London Arbitration. *See* Complaint ¶¶ 7–8; Sheinbaum 8/9/93 Aff. ¶ 7, Exh. 3.

14. After obtaining an award against Flopec in the Flopec Arbitration, Delta filed a petition to confirm the arbitration award on or about July 20, 1993, *In the Matter of the Arbitration Between Delta Petroleum (USA) Ltd. and Flota Petroleum Ecuatoriana,* 93 Civ. 4982. (Crawford Exh. 13.) The award

was confirmed on August 20, 1993, and judgment was entered on the award on September 15, 1993.

15. On August 9, 1993, Alvenus commenced this action to recover damages from Delta in the amount of $1,271,877.36. Alvenus obtained an order to show cause with temporary restraining order which temporarily enjoined the defendants from disposing of the Funds and sought a preliminary injunction enjoining the defendants from disposing of the Funds pending the outcome of this action. (The order to show cause was referred to Judge Preska as the then-sitting Part I judge.)

16. On August 20, 1993, Flopec and the Law Firm served and filed their Interpleader Complaint, seeking to have the Funds deposited into the registry of the Court. *Flota Petrolera Ecuatoriana v. Delta Petroleum (USA) Ltd., Alvenus Shipping Co. Ltd. and Fleet National Bank,* 93 Civ. 5878 (JFK) (hereinafter referred to as the "Interpleader Action"). (The Interpleader Action was accepted by Judge Keenan as related to 93 Civ. 5535.)

17. On September 10, 1993, the Court heard argument on Alvenus' motion for preliminary relief and Delta's motion to dismiss the Interpleader Action. (In the interests of continuity and with Judge Keenan's consent, Judge Preska heard argument.) At the conclusion of the argument, the Court ruled that Alvenus had demonstrated a substantial likelihood of success on the merits of its claims against Delta and had made a sufficient showing that any judgment awarded would be ineffectual so as to warrant a hearing on that issue and the continuation of the order staying the defendants from disposing of the Funds. The Court reserved decision on Delta's motion to dismiss the interpleader complaint. (September 10, 1993 Trans. at 35–39.)

18. At the conclusion of the September 10 hearing, Alvenus requested discovery of Delta on the outstanding issue. Over the objections of Delta, the Court permitted Alvenus limited discovery on an expedited basis and set a hearing date of September 17, 1993. (*Id.* at 35–36.)

19. After numerous discovery disputes and the parties' agreement to adjourn the hearing *sine die,* the Court eventually ordered all discovery to be completed by October 12, 1993, and the parties to advise the Court on or before October 13, 1993, whether either party wanted a hearing (which the parties were subsequently advised would be held on October 15, 1993, if a hearing was requested.)

20. On October 13, 1993, in a telephone conference between the Court and the attorneys for Delta and Alvenus, the Court was advised that neither side desired a live hearing, but both would instead rely on written submissions. Those submissions were received in October and November.

21. The depositions and financial documents contained in the parties' submissions show that all of Delta's stock is held by its parent, Ionian. Spiros Milonas is the President of Delta and Ionian. (Milonas Dep. Trans. at 10, 12.) Delta has no employees. It uses Ionian's space at 1790 Broadway, New York, New York for a $1,000 monthly fee and any work contracted by Delta is performed by Ionian employees. (Milonas Dep.Trans. at 9, 10, 12, 19, 28.) Delta did not pay any compensation to any employee in 1991, 1992, or 1993. (Asante Dep.Trans. at 14–16; Milonas Dep.Trans. at 62, 63.) Mr. Milonas presently owns 18 percent of Ionian's shares. (Milonas Dep. Trans. at 10.)

22. Delta or a predecessor has been in existence since 1984. (Affidavit of Andrew Dafnos, sworn to on August 30, 1993, Exh. A.) From the documentation produced by Delta for 1991 and 1992, it appears that Delta had: a negative taxable income of ($ – 305,790) in 1991; a negative taxable income of ($ – 1,004) in 1992; negative taxable incomes in 1986, 1988, 1989 and 1990; $1,780 in cash at the end of 1991; $4,293 in cash at the end of 1992; total assets of $183,912 at the end of 1992 (consisting mainly of accounts receivable); a debt (from alleged loans) of $411,700 to its parent, Ionian, at the end of 1992; as of 8/31/93, assets of $477,740 (all of which were accounts receivable), out of which $406,737 was the proceeds of the Flopec Arbitration award; and zero cash as of 8/31/93. (Milonas Dep.Exhs. 1A, 1B, 1C, 1D,

3, 4, 8, 9; Asante Dep.Trans. at 6–10, 13, 14, 30, 38; Milonas Dep.Trans. at 42–43.)

23. As indicated above, Delta's Balance Sheet for 1993 (as of August 31) shows total assets (on an accrual basis) of $477,740. (Milonas Exh. 1A.) Delta's Statement of Income for 1993 (as of August 31) shows revenue (on an accrual basis) of $48,000 from "Management Fees," and $406,737 from some "other" source (Milonas Exh. 1B). That "other" source is the Flopec Arbitration award. (Crawford Exh. 2, at 14; Milonas Dep.Trans. at 25; Asante Dep.Trans. at 8.) Therefore, Delta, a company that generated sales (charter hire) from its shipping business of $4,031,437 in 1991, and $4,226,750 in 1992 (Milonas Exhs. 3 and 4, line 1a) has been reduced to accrued revenue of $6,000 a month since Mr. Milonas spoke to Mr. Crawford in October of 1992.

24. In 1991 and 1992, the chartering in and chartering out of the vessels HALIFAX and WHITE SEA was Delta's entire business. (Milonas Dep.Trans. at 14–19, 20); Asante Dep.Trans. at 16–17.) With the redelivery of the WHITE SEA to Alvenus in September of 1992, Delta ceased doing any significant business, as its general ledger sheets for 1993 show. (Asante Exhs. 1 and 2.) Delta's Statement of Cash Flows for the eight months ended August 31, 1993 shows its cash reduced to zero at the end of the period. (Milonas Exh. 1D.)

25. Although Mr. Milonas made reference in his deposition to seeking another charter for Delta or doing some oil trading in the future (Milonas Dep.Trans. at 31), there has been no charter since September 1992. Delta's only present business is as the middleman manager of a tug (the "HERCULES"), which management it subcontracts to Ionian. (Milonas Dep.Trans. at 18, 19, 20, 21, 23, 24, 33.)

26. The deposition testimony establishes that Delta's insolvency is not unintentional. Mr. Asante, an accountant for Ionian, who prepared Delta's 1993 Balance Sheet and was in charge of Delta's General Ledger entries on a daily basis, testified that it was Delta's practice to keep its checking account at zero at the end of every month during 1993. (Asante Dep.Trans. at 3–6, 25–26.) For example, in January 1993, Delta began the year with $4,293.26 in its checking account. It received $16,383.27 from Ionian on January 7 (for what, Mr. Asante could not say), raising its cash on hand to $20,676.53. (Asante Dep. Trans. at 23.) Delta then paid $18,000 to Ionian on January 11 (for what, again Mr. Asante could not say) (Asante Dep.Trans. at 23), thereby reducing Delta's available cash to $2,676.53. Delta paid $748.16 to MCI on January 15, which reduced its cash to $1,928.37. On January 22, Delta transferred exactly $1,928.37 to its parent, Ionian, emptying Delta's account of all cash as of January 22, 1993. Mr. Asante, however, had written a $672.63 check against Delta's account to MCI on January 15. To cover the $672.63, Ionian transferred exactly $672.63 to Delta on January 26, keeping the account at zero. On January 26, Asante wrote a $256.44 check against Delta's account to Delta's vice president, Mr. Dafnos, and that check was covered by a transfer of exactly $256.44 from Ionian's account to Delta's on January 27. Mr. Asante apparently overlooked a $59.06 check that had been written against Delta's account on January 28, and so the month of January 1993 concluded with Delta $59.06 overdrawn. The first transaction in February 1993 is a transfer of exactly $59.06 from Ionian to Delta to cover the overdraft.

27. Mr. Asante also testified that standing orders were given by Mr. Milonas to Ionian's and Delta's bankers to cover Delta's overdrafts out of Ionian's account. (Asante Dep.Trans. at 31, 32.)

28. Of the nine transactions that occurred in January 1993, six of them were money transfers between parent and subsidiary. (Asante Dep., Exh. 1.) Except for three telephone or communication bills, there is no sign of business or financial contact between Delta and anyone other than its parent for the month of January 1993. (*Id.*) This pattern remains essentially unchanged for each month since. (*Id.*)

29. The policy of zero-based, or near-zero-based, checking appears in each month of 1993, as shown on the General Ledger. For example, to stay at zero in February 1993, Delta transferred to Ionian the entire

$129,539.33 arbitration award Delta collected from a company called Fritzen. (Asante Dep.Trans. at 26, 27; Asante Exh. 1.) Delta's witness testified that this payment was made to pay down loans owed by delta to its parent, Ionian. (Asante Dep.Trans. at 27 and 30.) Delta's witness also testified that if the Funds were released to Delta, they would be used to pay attorneys and as operating capital. (Milonas Dep.Trans. at 64–66.)

30. In summary, as it now stands, Delta has no assets, no cash in its one bank account, does no business (except for a minor tugboat managing arrangement), has no employees and no office of its own. Ionian has already taken over a substantial arbitration award won by and paid to Delta. Based on this history, the likelihood is high that the Funds will be paid to Ionian if Alvenus' rights are not protected by this Court. That would be particularly unfair in this case since Delta succeeded in its arbitration against Flopec, in large part, by presenting claims that belong to Alvenus, on Alvenus' documents, and on calculations made by Alvenus and presented to Delta.

31. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333.

■ 32. In *Borden Inc. v. Meiji Milk Products Co., Ltd.,* 919 F.2d 822, 825–27 (2d Cir.1990), *cert. denied,* 500 U.S. 953, 111 S.Ct. 2259, 114 L.E.2d 712 (1991), the Second Circuit stated that "entertaining an application for preliminary injunction in aid of arbitration is consistent with the court's powers pursuant to § 206" of the Convention. 919 F.2d at 826.

33. Alvenus has moved for, *inter alia,* a preliminary injunction and/or an order of attachment enjoining the defendants from disposing of the Funds, *viz.,* the proceeds of the Flopec Arbitration, and/or an order attaching the Funds pending the outcome of the London Arbitration.

■ 34. Under Rule 65, a preliminary injunction will be issued upon a showing of irreparable harm and the likelihood of success on the merits. *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990). As found by the Court at the conclusion of the August 20, 1993 argument, Alven-

us has demonstrated the likelihood of success on the merits. (*See* Sheinbaum 8/9/93 Aff., ¶¶ 7–13.) Therefore, irreparable harm is the remaining issue. (September 10, 1993 Trans. at 35.)

■ 35. As a general rule, irreparable harm is not present when the plaintiff has a claim for money damages. *In Re Feit & Drexler, Inc.,* 760 F.2d 406, 416 (2d Cir.1985); *Hoxworth v. Blinder Robinson & Co., Inc.,* 903 F.2d 186, 205 (3rd Cir.1990). However, an exception to the general rule exists when it is shown that a money judgment will go unsatisfied absent equitable relief. *Hoxworth,* 903 F.2d at 205; *Fleet Nat. Bank v. Trans World Airlines, Inc.,* 767 F.Supp. 510, 517 (S.D.N.Y.1991); *Teamsters Freight, etc. v. Southern Forwarding Co.,* 424 F.Supp. 11, 13–14 (M.D.Tenn.1976).

36. Alvenus has demonstrated that absent equitable relief from this Court, a money judgment in the London Arbitration will go unsatisfied. There is nothing in the record that even remotely suggests that Delta could pay Alvenus' likely award in the London Arbitration. Accordingly, Alvenus is entitled to an injunction pursuant to Rule 65.

37. In the alternative, Rule 64 incorporates state-law provisional remedies. One such remedy under New York law is an injunction in aid of arbitration pursuant to CPLR § 7502(c).

38. Section 7502(c) permits a court to order an attachment or an injunction in aid of arbitration where it appears that an award "may be rendered ineffectual without such provisional remedy." CPLR § 7502(c). The movant's burden of proof under CPLR § 7502(c) might, therefore, be seen as less than the burden of proof applicable to Rule 65 injunctions, *see Drexel Burnham Lambert Inc. v. Ruebsamen,* 139 A.D.2d 323, 531 N.Y.S.2d 547 (1st Dep't 1988), *appeal denied,* 73 N.Y.2d 703, 537 N.Y.S.2d 490, 534 N.E.2d 328 (1988), although Judge McLaughlin indicates in his Practice Commentary that the burden of proof under both Rule 65 and CPLR § 7502(c) should be the same, *i.e.,* irreparable harm. McLaughlin, *Practice Commentary,* N.Y.Civ.Prac.Law § 7502 (McKinney 1993), at 75. Applying the strict-

**488**

er standard espoused by Judge McLaughlin, the result is the same in this case—Alvenus has carried that burden in demonstrating that any award it may recover against Delta "may be rendered ineffectual" without equitable relief and, thus, that without injunctive relief it will be irreparably harmed.

39. *Cooper v. De La Motobecane*, 57 N.Y.2d 408, 456 N.Y.S.2d 728, 442 N.E.2d 1239 (1982), is no bar to the issuance of an injunction in aid of arbitration. *Cooper* certainly does not prohibit the issuance of a preliminary injunction under Rule 65. *Cooper* also conflicts with *Borden Inc. v. Meiji Milk Products Co., Ltd.*, 919 F.2d 822, 825–827 (2d Cir.1990), *cert. denied*, 500 U.S. 953, 111 S.Ct. 2259, 114 L.Ed.2d 712 (1991). In addition, *Cooper* itself recognizes an exception for claims arising out of maritime contracts (such as the charter party involved in this case). (Complaint at ¶ 1.) *See Cooper*, 57 N.Y.2d at 415, 456 N.Y.S.2d at 731, 442 N.E.2d at 1242. Finally, *Cooper* was decided before the enactment of CPLR § 7502(c), which permits attachment or injunction in aid of arbitration. In permitting injunctions in aid of arbitration, CPLR § 7502 brings New York State in line with every signatory of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards. *See* McLaughlin Practice Commentary, N.Y.Civ.Prac.Law § 7502 (McKinney 1994) at 76.

Accordingly, it is

ORDERED that defendants Law Firm, Flopec and Fleet Bank shall transfer the Funds plus accrued interest, if any (the "Trust Funds") to Cardillo & Corbett, as attorneys for Delta. The Trust Funds shall be deposited in an interest-bearing trust account of the latter attorneys in a reputable commercial bank in this District (the identity of which is to be made known to counsel for Alvenus) or in some other interest-bearing account, as agreed upon by counsel for Alvenus and Delta; and it is further

ORDERED that Delta and its attorneys, Cardillo & Corbett, are enjoined from transferring the Trust Funds or any interest accruing thereon, except as set forth above, pending and subject to the outcome of the London Arbitration between Alvenus and Delta. The ultimate right to the Trust Funds and any interest accruing thereto is to be determined by the outcome of the London Arbitration; and it is further

ORDERED that as Alvenus and Delta have requested and apparently agreed, they are directed to proceed with the London Arbitration pursuant to the arbitration clause in the Head Charter and their agreement in this Court (September 10, 1993 Trans. at 2–3); and it is further

ORDERED that upon the completion of the transfer of the Funds to Cardillo & Corbett ordered above, the Law Firm, Flopec, and the Bank are dismissed from this action. This action, 93 Civ. 5535, is stayed pending the conclusion of the London Arbitration; and it is further

ORDERED that the Interpleader Action (the action bearing Civil Action No. 93 Civ. 5878) is stayed as moot pending the outcome of any appeal in this matter; and it is further

ORDERED that under all the circumstances, including but not limited to the fact that the funds in question will be earning interest, Alvenus is to file an undertaking as security in the amount of $10,000 within ten days of the filing of this order.

SO ORDERED.