[783 NYS2d 330]

URBAN ARCHAEOLOGY LTD. et al., Appellants, et al., Plaintiff, v
DENCORP INVESTMENTS, INC., et al., Respondents.

First Department, October 5, 2004

APPEARANCES OF COUNSEL

*Alpert Butler Sanders Norton & Bearg, P.C.*, New York City (*Clark E. Alpert* and *Jason R. Melzer* of counsel), for appellants.

*Lapidus & Associates, LLP*, New York City (*Steven R. Lapidus* and *Robert N. Fass* of counsel), for respondents.

## OPINION OF THE COURT

MAZZARELLI, J.P.

In June 1988, plaintiff Gil Shapiro, Leonard Schecter, and defendant Allan Reiver formed a partnership, Urban Archaeology Company (the Company), to market architectural antiques and high-end architectural reproductions. Shapiro and Schecter contributed inventory from their existing architectural salvage business, and Reiver invested over $1 million in new inventory. The business, headquartered at 143 Franklin Street, is equally owned by plaintiff Urban Archaeology Ltd. (Limited) and defendant Dencorp Investments, Inc. (Dencorp).

The day-to-day business of the Company, which currently employs more than 80 individuals, was run by plaintiff Shapiro, with the assistance of plaintiff Geraldine Ronan, the general manager. Early on, defendant Reiver negotiated an increase in the Company's space and managed construction of the expanded facilities. He has since been essentially a silent partner, visiting the Company's office approximately twice a month. Under the management of Ronan and Shapiro, the Company has increased its revenues from $40,000 in 1988 to $12 million in 2002, with a high level of profitability. As a result, both Shapiro and Reiver have received substantial yearly distributions.

When the Company was formed, Limited and Dencorp had executed an agreement to govern the partnership's affairs. Section 11 of the agreement contained a "put-and-call"* buyout option, which could be triggered by either partner if it deter-

---

* As commonly used a "put" is defined as an "option permitting its holder to sell a certain stock or commodity at a fixed price for a stated quantity and within a stated period. Such a right is purchased for a fee paid the one who agrees to accept the stock or goods if they are offered. The buyer of this right to sell expects the price of the stock or commodity to fall so that he can deliver the stock or commodity (the put) at a profit" (Black's Law Dictionary 1112-1113 [5th ed]).

mined that dissolution of the partnership was warranted. As applied here, the "put" portion of the option allowed either partner to set a selling price, and the other partner could choose to buy the partnership at that price. The "call" portion of the option provided that if the purported buyer did not commit in writing to buy the Company at the selling price within 90 days, the partner that fixed the price was required to purchase the Company for that same amount. The attempted execution of that buyout provision is the subject of this appeal. As relevant, it provides:

> "11.1 Exercise of Option. Either Partner (the 'Offeror') may, at any time, by written notice (the 'Notice') to the other Partner (the 'Offeree') offer to sell all of its interest in the Partnership to the Offeree. The Notice shall specify the price for the Offeror's interest in the Partnership, which shall be subject to adjustment as provided in paragraph 11.2 below (the price specified in the Notice, as adjusted pursuant to paragraph 11.2 being hereinafter referred to as the Purchase Price). The terms of the purchase shall be as specified in paragraph 11.3 below. *The Offeree shall have 90 days after the date the Notice is given within which to elect to accept the offer and purchase the Offeror's interest in the Partnership by giving written notice of acceptance to the Offeror.* If the Offeree gives written notice of acceptance of the offer within the 90-day period, the Offeror shall sell and the Offeree shall purchase the Offeror's interest in the Partnership at the Purchase Price and on the terms of paragraph 11.3. If the Offeree fails to give the Offeror written notice of acceptance within the 90-day period, the Offeree shall sell and the Offeror shall purchase the Offeree's interest in the Partnership at the Purchase Price and on the terms of paragraph 11.3.

> "11.2 Purchase Price. The Purchase Price shall be the price specified in the Notice adjusted as follows:

> "11.2.1 Adjustment for Unequal Capital Accounts.

---

Again, as commonly considered, a "call" is defined as "[a]n option or contract giving the holder the right to demand a stated number of shares of stock at a specified price on or before a certain fixed date" (Black's Law Dictionary 185 [5th ed]).

If the capital accounts of the Partners are not equal at the time of closing of the purchase, the purchase price for the Offeree's interest shall be equal to the price specified in the Notice for the Offeror's interest increased by the amount by which the Offeree's capital account exceeds the Offeror's capital account or decreased by the amount by which the Offeree's capital account is less than the Offeror's capital account; and

"11.2.2 Adjustment for Dencorp Purchase. If Dencorp is the purchaser, the price for Urban's interest as determined above shall be increased by $300,000 (the 'Urban Premium').

11.3 Terms of Option. The closing of the purchase and sale under this Section 11 shall take place at the principal place of business of the Partnership within 90 days after the expiration of the 90-day period described above at a time designated by the purchasing Partner. At the closing the selling Partner shall assign its interest in the Partnership to the purchasing Partner, free and clear of all liens and encumbrances. . . . In addition to payment of the purchase price, the purchasing Partner, at the closing, shall assume all of the liabilities of the Partnership and, to the extent reasonably possible, shall cause the selling Partner to be released from all liabilities of the Partnership and the shareholders and other affiliates of the selling Partner to be released from all guarantees of Partnership obligations . . . The terms of this Section 11 shall be specifically enforceable by either Partner." (Emphasis added.)

The agreement also required that "[t]he Partners shall maintain or cause to be maintained . . . true and proper books, records, reports, and accounts" (¶ 4.1), "open to inspection by either Partner" (¶ 4.3).

In February 2003, Shapiro advised Reiver of his "probable intent" to implement the option. Plaintiffs claim that, in response, Reiver stated that he would do everything in his power to frustrate performance of the option, and that he made a number of threats designed to deter Shapiro from implementing the process. According to plaintiffs, in March 2003, Reiver doubled the frequency of his visits to the Company's offices,

requested detailed financial information, and questioned the way the business was being run. They claim he also harassed, intimidated and berated key employees, including the general manager, plaintiff Ronan. Plaintiffs allege that this conduct was designed to compel Shapiro to make an exorbitant lump-sum buyout offer or forgo the implementation of the option.

On April 30, 2003, plaintiffs filed this action seeking, among other things, specific performance of the option, free from any interference or harassment by defendants. On May 1, 2003, the IAS court granted plaintiffs a restraining order directing Reiver to cease harassing Ronan. Limited also served Dencorp with written notice of its intent to exercise the option at a purchase price of $6 million. According to the terms of the agreement, Dencorp had until July 31, 2003 to either purchase the partnership or sell its interest to Limited. In response, defendants counterclaimed, asserting the right to a judicial audit, and cross-moved, inter alia, for a preliminary injunction tolling the 90-day period Dencorp had to exercise the option.

In support of the cross motion for a stay, Reiver asserted that Limited was in violation of the partnership agreement. He argued that plaintiffs blocked nearly all of Dencorp's access to the Company's financial records, including information which would allow him to confirm the accuracy of the Company's capital accounts, and were falsely characterizing his legitimate inquiries as harassment. This, Reiver alleged, prevented Dencorp from acquiring the information necessary to decide whether to exercise the option. Defendants' accountant averred that the Company's records were such that they would "severely hamper the ability of any reasonable businessperson to make a decision concerning the purchase or sale of [the Company] without a substantial due diligence investigation." Schecter, Shapiro's former partner whom Shapiro had bought out in 2000 for $2.5 million, submitted an affidavit in favor of Reiver stating that Shapiro had historically denied Schecter and Reiver access to the books and records. Schecter also stated that the Company kept no physical inventory, and he accused Shapiro of furnishing two of his own homes with Company assets.

In opposition to Dencorp's cross motion, Shapiro averred that Reiver's complaints about the business were all raised as a direct result of Shapiro's exercise of the option, and that Reiver had made no complaints about how the business had been run in the prior 15 years of its existence. Shapiro also affirmed, and Ronan corroborated, that the documentary evidence demon-

strated that Shapiro had cooperated with Reiver's requests for information. Mark Ives, a member of Ives & Sultan, LLP, the company which had served as accountants to Urban Archaeology since its inception in 1988, submitted an affidavit stating that he and his firm have consistently responded in a timely manner to Reiver's inquiries. Ives also noted that while the parties' original capital contributions differed by $503,808, Reiver and Shapiro had directed him to equalize the capital accounts with an adjustment in Shapiro's favor in 1989. Ives also affirmed that in 1998, a second adjustment to the capital accounts was made in Shapiro's favor because the profits from a separate transaction had been divided unequally for tax purposes. Ives affirmed that the capital accounts as of December 31, 2002 were $966,174 for Limited and $999,664 for Dencorp. Reiver denied ever authorizing the capital account adjustments and claimed they were in violation of the partnership agreement.

On June 24, 2003, the IAS court issued an order stating that Reiver's inquiries, while offensive in manner, were appropriate where the two owners of a multi-million dollar company were actively investigating their positions relative to the exercise of a buyout option. The court held defendant's cross motion, which sought a number of limitations on corporate spending, in abeyance, and scheduled a hearing for July 15, 2003. This order was not appealed.

By order dictated on the record on July 21, 2003, the court stayed the expiration of the option until September 15, 2003. It accepted defendant's argument that it had not been able to fairly evaluate the terms of the option without access to the corporate books and records. However, the court also stated that it was possible that defense counsel "[was] trying to draw the Court in[to] a quagmire which [was] not contemplated by the [partnership agreement]."

In the second order appealed, entered September 25, 2003, the court extended the expiration of the option until October 22, 2003. It stated that it did so, "to preserve the *status quo* and to permit a knowing exercise of the right to exercise the option or to decline to exercise it, as well as to begin to arrange for any necessary financing for the payment of the required portion of the purchase price." Plaintiffs were also restrained from "engaging in or authorizing expenditures, dispositions, encumbrances, purchases, acquisitions or transfers in relation to [the Company] except in the ordinary course of business."

Next, on October 22, 2003, the parties appeared before the same IAS court in connection with another case involving an-

other corporation run by the same principals. The court inquired about the status of the instant matter, and defense counsel advised the court that it had not received a copy of the September decision. Defense counsel requested a further extension of the option period, and, in the third order appealed (dated October 22, 2003), the court granted an additional 15-day extension.

On November 8, 2003, plaintiff sent Dencorp notice of its intention to close on Dencorp's interest in the Company, stating that the option had indisputably expired. The parties again appeared in court on November 12, 2003, and defense counsel argued that it had not been served with the October 22 order. In the final order appealed (dated November 12, 2003), the court granted an extension of the stay until November 17, 2003.

On November 13, 2003, defendant served written notice of its election to exercise the option at the $6 million purchase price. Plaintiffs appeal from each of the four orders staying expiration of the option provision. On December 13, 2003, this Court consolidated the four appeals, and the parties consented to a stay pending appeal. We dismiss the appeals from the first three orders as superseded by the appeal from the November 18, 2003 order, and we reverse that order.

It has long been the law of this State that the members of a partnership may include within their written contract "any agreement they wish concerning the sharing of profits and losses, priorities of distribution on winding up of the partnership affairs and other matters," as long as no part of the agreement conflicts with "prohibitory provisions of the statutes or of rules of the common law relating to partnerships, or considerations of public policy" (*Lanier v Bowdoin*, 282 NY 32, 38 [1939]; *Riviera Congress Assoc. v Yassky*, 18 NY2d 540, 548 [1966]). Further, where "the parties have entered into a complete partnership agreement, the rights of the partners are fixed and controlled by that agreement" (*Ayerslee Corp., N.Y. v Overlook Sponsor Corp.*, 618 F Supp 1398, 1403 [1985], *affd* 800 F2d 1127 [1986]; *Lanier*, 282 NY 32, 38 [1939], *supra*; *Raymond v Brimberg*, 99 AD2d 988, 988-989 [1984], *appeal dismissed* 64 NY2d 775 [1985]).

For example, where a partnership agreement provided that no litigation could be commenced, except in the ordinary course of business, without the affirmative vote of 75% of the partnership interests, a suit approved by only 55.45% of the partnership interests was dismissed (*Heritage Co. v LaValle*, 199 AD2d

1036 [1993]). This was required "[b]ecause the detailed partnership agreement [was] a complete expression of the partners' intentions" and thus the court was without power to rewrite its terms (*id.*).

In light of this rule we examine the issue presented here: whether the IAS court could alter the provisions of the partnership agreement, which laid out the procedures for a buyout with an express 90-day limitation on its exercise, by repeatedly granting extensions of that time period. In determining the importance of delayed performance under the terms of a contract, various factors are to be considered, on a case-by-case basis and include: "the nature and object of the contract, the previous conduct of the parties, the presence or absence of good faith, the experience of the parties and the possibility of prejudice or hardship to either one, as well the specific number of days provided for performance [in the agreement]" (*Ben Zev v Merman*, 73 NY2d 781, 783 [1988]). While the parties can assure a finding that "time is of the essence" by including those, or equivalent words, within their agreement (*Cheney v Libby*, 134 US 68 [1890]), specification of a particular time frame within the language of the contract by itself is not determinative of whether a delay would constitute a material breach of the agreement (*Burgess Steel Prods. Corp. v Modern Telecoms., Inc.*, 205 AD2d 344 [1994]).

However, the clause under consideration here is one for the exercise of an option. Not only is strict adherence to the terms of an option ordinarily required, but it is a broadly accepted principle that time is of the essence with this type of contractual provision. As one author who conducted a study of option contracts comments,

> "A litany of . . . case authority and critical commentary reinforces the proposition that strict compliance with the terms of an option is generally required. The 'time is of the essence' principle, employed either constructively or through the explicit language of an agreement, provides a glowing illustration of judicial predilection to interpret option contracts in favor of the optionor" (Cozzillio, *The Option Contract: Irrevocable Not Irrejectable*, 39 Cath U L Rev 491, 536).

This is because courts have recognized the importance of these types of provisions.

> "In an option contract, the party giving the option

is protected only by the condition that the optionee can only exercise it strictly in accordance with its terms. . . . Consequently, whether the question arises either at law or in equity, *it is well settled that time is of the essence of an option. No express provision making time of the essence is required in an option contract for it to be so, since an option by its very terms must be exercised within a specified time and otherwise in accordance with specified conditions*" (15 Williston, Contracts § 46.12, at 445-452 [4th ed] [emphasis supplied]).

New York courts have consistently reaffirmed this principle that an optionee can only exercise the option in strict accordance with its terms (*see Willmott v Giarraputo*, 5 NY2d 250 [1959]; *Ittleson v Barnett*, 304 AD2d 526, 528 [2003]; *see also* 22 NY Jur 2d, Contracts § 285). While these cases involved options to purchase real property, the same principles apply to "commercial contracts" and "executory contracts to buy and sell" (22 NY Jur 2d, Contracts § 285). Accordingly, the 90-day time limit specified for the buyout option in the instant partnership agreement should not have been altered.

Moreover, were one to assume that the court had the authority to grant an injunction extending the buyout option in an exceptional circumstance, it could only have done so where the equities required drastic relief. And, it would have been required to conduct the requisite analysis of whether the movant, here Dencorp, had made a clear showing of a likelihood of success on the merits, danger of irreparable injury in the absence of an injunction, and a balancing of the equities in its favor. This the IAS court failed to do before granting Dencorp any of the four extensions of the option period in this case (*Aetna Ins. Co. v Capasso*, 75 NY2d 860, 862 [1990]; *W.T. Grant Co. v Srogi*, 52 NY2d 496 [1981]).

In addition, an examination of the record shows no support for according Dencorp the right to enjoin plaintiff from executing the buyout option pursuant to the terms of the partnership agreement (*see Aetna*, 75 NY2d 860 [1990], *supra*; *Sterling Fifth Assoc. v Carpentille Corp.*, 5 AD3d 328 [2004]). Dencorp did not establish a likelihood of success on the merits. While one of the factors the court pointed to in granting Dencorp more time was a necessity for Dencorp to obtain financing, the partnership agreement has no financing contingency clause. In paragraph 11.1 of the partnership agreement, it clearly states that the of-

feree has 90 days from the exercise of the option, which took place here on or about May 1, 2003, to either purchase the Company at the specified price or to allow the offeror to do so. The IAS court was also concerned about the fairness of the price. However, the partnership agreement allows either partner to set the value of the buyout offer, and a judicial valuation of the Company is not a prerequisite to consummation of the transaction (*see Hand v Kenyon & Kenyon*, 227 AD2d 137 [1996] [holding that where a partnership agreement set forth the exclusive method for distributing the partnership's assets upon dissolution, plaintiff waived his right to a judicial accounting]). Further, Dencorp's allegation that as a result of Limited's misappropriation of the Company funds and active concealment of financial information, it was unable to ascertain whether $6 million was a fair price is unsubstantiated. It is of note that prior to Limited's exercise of the option, Dencorp had made no complaints about the financial state of the Company or its management.

Dencorp also failed to establish that it would have been irreparably harmed by strict enforcement of the terms of the buyout provision of the partnership agreement. In fact, it appears that the opposite is true. Plaintiff convincingly argues that as the state of the partnership remains in limbo, important employees are resigning their positions with the Company, causing the partnership irreparable injury because of the delay.

In conclusion, the orders staying the instant buyout were in violation of the express terms of paragraph 11.1 of the partnership agreement, which specified that the offeree had exactly 90 days to determine whether or not to purchase the Company for the price set by the offeror. The "put-call" procedures, which do not conflict with any statute or common-law rule, were detailed in the agreement with an express time limit. Simply, the court was without the power to rewrite these terms and to extend the buyout option beyond the contractually agreed-upon 90-day period (*Heritage*, 199 AD2d 1036 [1993], *supra*). That provision allowed either partner to become the "Offeror," and to set an option price, without resort to financial statements or a judicial accounting. The other partner could then accept or reject the offer. If the offeree declined, then the offeror was required to purchase the company at the price it had originally set. The only adjustment allowed was what was necessary to address any inequality in the parties' capital accounts. In granting defendants' repeated injunctions, the IAS court impinged upon the

parties' rights, as sophisticated businesspeople, to draft and demand adherence to an agreement governing the affairs of the Company created by them (see Heritage, 199 AD2d 1036 [1993], supra). Finally, given that the parties had been operating pursuant to the terms of the partnership agreement without objection since the inception of the Company, the equities weigh in favor of strict adherence to the provisions set forth in that agreement (see Hand, 227 AD2d 137 [1996], supra).

Accordingly, the order of the Supreme Court, New York County (Diane A. Lebedeff, J.), dated November 12, 2003/ entered on or about November 18, 2003, which stayed the expiration of the 90-day period defendant Dencorp had to exercise the buyout option contained in the partnership agreement of Urban Archaeology Company, should be reversed, on the law, with costs, and the stay vacated. Appeals from orders, same court and Justice, dated July 21, 2003/entered November 13, 2003, dated September 23, 2003/entered September 25, 2003 and dated October 22, 2003/entered November 13, 2003, respectively, should be dismissed, without costs, as superseded by the appeal from the order dated November 12, 2003/entered on or about November 18, 2003.

SULLIVAN, FRIEDMAN and GONZALEZ, JJ., concur.

Order, Supreme Court, New York County, dated November 12, 2003/entered on or about November 18, 2003, reversed, on the law, with costs, and the stay of the 90-day expiration period vacated. Appeals from orders, same court, dated July 21, 2003/ entered November 13, 2003, dated September 23, 2003/entered September 25, 2003 and dated October 22, 2003/entered November 13, 2003, dismissed, without costs, as superseded by the appeal from the order dated November 12, 2003/entered on or about November 18, 2003.