OPINION OF THE COURT
Carol Edmead, J.
I. Procedural History
This proceeding for injunctive relief arises from an alleged breach of agreement between petitioner CanWest Global Communications Corp. and respondent Mirkaei Tikshoret Limited, doing business as Mirkaei Tikshoret Group (MTG), in which the parties agreed to, inter alla, (1) jointly acquire assets of the JPost Group (including without limitation the Palestine Post Limited [PPL] and Jerusalem Post Publications Limited [collectively the JPost Group]) from Hollinger International Inc., (2) transfer such assets to an entity jointly owned by the parties, and (3) permit CanWest to control the board of such entity and establish editorial policy (the agreement).
A. The June Letter Agreement
By letter agreement dated June 11, 2004, the parties expressed the following:
“This letter [‘LOI’] is intended to summarize the principal terms of a proposal being considered by [CanWest] and [MTG] regarding the Parties’ . . . acquisition [‘Possible Acquisition’] of either all of the shares of those corporations operating or owning, or all of the assets comprising [the JPost Group]
“[T]he entity to be established by the parties as the vehicle to acquire the [JPost Group] is sometimes called the ‘Company’ . . .
“[W]e envisage the Parties being equal 50/50 shareholders in the newly-formed Company . . . We will jointly work towards establishing a viable business plan for [the JPost Group] that will provide us with the assurance that any Bid (defined below) we submit will lead to a successful re-establishment of a profitable Jerusalem Post and Jerusalem Report . . . [W]e have outlined . . . the process we suggest be adopted in developing the business plan and finalizing a mutually acceptable Bid and, in Schedule A attached hereto, the terms of a shareholders agreement that would be acceptable once the Bid is submitted to and accepted by [Hollinger]. The pro *847 cess we suggest be adopted is as follows:
“1 . . . Until the Termination Date (defined below), the Parties will deal with each other only on an exclusive basis in connection with the Possible Acquisition and, accordingly, subject to paragraph 7 hereof, until the Termination Date, the Parties will not . . . solicit or entertain any arrangement whereby such Party will . . . consider proceeding with, or entertaining any proposal of, any third party relating to the Possible Acquisition . . .
“4. The Company will be established by the Parties for the purposes of . . . submitting an offer for the [JPost Group] and/or all of its assets, and thereby completing the Possible Acquisition.
“5 . . . the completion and submission of the Bid shall be subject to the following conditions precedent in favour of each Party . . .
“(b) Development and acceptance of the initial twelve (12) months business plan in respect of the [JPost Group]; . . .
“(d) Successful negotiation and execution of a definitive shareholders agreement in respect of the Company and the [JPost Group] incorporating the provisions of this LOI and Schedule A . . . ; and “(e) Approval by each Party’s board of directors of the final terms of the Bid . . .
“7. Either party has the right (a) at any time, to withdraw from submitting the Bid if it determines in its absolute discretion that, in its judgment, the conditions precedent in paragraph 5 hereof will not be capable of being fulfilled to its satisfaction . . . [T]he party that has provided notice of [withdrawal or decision not to proceed] shall not, directly or indirectly, solicit or entertain any arrangement whereby such Party will, either alone or in conjunction with a third party, submit a bid or offer to acquire the [JPost Group] for a period of twelve (12) months following the [withdrawal or decision not to proceed].”
According to CanWest, between June 11 and August 9, 2004, the parties conducted due diligence on the businesses to be acquired, and held discussions of how best to structure their joint bid. CanWest contends that MTG suggested that it was in a better position to “strong-arm” the JPost Group’s creditors if *848 it alone was seen to be owner and operator of the JPost Group shares. For this and other reasons, the parties agreed to a purchase of all the shares and securities by MTG pursuant to a jointly developed bid, followed by a sale of all the assets to a new, jointly owned entity.
B. The November Letter Agreement
Subsequently, by letter dated November 10, 2004, the parties entered into a further agreement, in which the parties “confirmed that MTG, with the concurrence of CanWest has today submitted to Hollinger ... an offer to purchase the Shares of the PPL ... in favour of MTG (in either case ‘SPA’).” The letter further provides:
“In the event that the SPA is accepted by Hollinger . . . then the following shall occur:
“1. MTG and CanWest shall negotiate in good faith to finalize, on or before the closing of the transaction described in the SPA, the terms by which MTG shall [sell] . . . the assets comprising PPL and its subsidiaries, to a joint venture, limited partnership or similar entity (‘Partnership’) which will be owned and funded by MTG and CanWest equally (50% each) on the basis that MTG will indemni[f]y and save harmless the Partnership in respect of certain liabilities of, and claim against, PPL and it subsidiaries.
“2. MTG and CanWest shall negotiate in good faith to finalize the terms of, and complete those agreements and conditions precedent referred to [in] paragraph 5 of the LOI [agreement], on or before the closing of the transaction described in the SPA
“In the event that the parties are unable to satisfy to their mutual satisfaction, the provisions of paragraph 1 and 2 of this letter agreement, and MTG nevertheless completes the purchase of the PPL in accordance with the SPA . . . then (a) Can-West shall have no obligation to participate in the SPA or purchase of the PPL in any manner, and (b) the provisions of paragraph 3 of the LOI shall be deemed to be amended such that each of MTG and CanWest shall be [responsible] for their own costs and expenses incurred at any time in connection with the purchase or attempted purchase of the PPL.”
*849 On November 15, 2004, the offer was submitted and accepted by Hollinger, who, according to CanWest, set the closing date of no earlier than December 23, 2004.
CanWest contends that with the first step of the acquisition underway, it proposed, again, that the parties form an Israeli limited partnership to acquire the JPost Group assets, with 99% of the limited partnership owned on a 50/50 basis by corporations owned by CanWest and MTG, and the other 1% held by a general partner also owned 50/50 by CanWest and MTG. MTG endorsed this concept and on November 22, 2004 provided a draft asset purchase agreement (APA), wherein JPost Group assets were to be purchased by the limited partnership.
On November 28, 2004, CanWest made certain comments concerning the draft APA, and MTG suggested that CanWest take over responsibility for producing the next draft.
On December 9, 2004, CanWest urged MTG to have Hollinger consider setting the closing for December 31, 2004 and resolve accounting and other issues before the closing. CanWest also proposed a date of December 14, 2004 for MTG and CanWest to review the draft agreements and work through their own internal checklist for closing.
On December 10, 2004, MTG indicated that “[w]ith respect to the date of closing, it seems it is now more in the hands of Hollinger than in our hands.” In response, CanWest reiterated the reasons for closing on December 31, 2004.
On December 15, 2004, MTG and Hollinger closed on the transaction, without notice to CanWest, and notwithstanding the fact that the parties had not yet established the new entity nor agreed upon the final documents. On the same day, Can-West wrote to MTG expressing their desire to “focus on the next phase, i.e. the establishment of the partnership and the acquisition of the assets and to have this phase completed by December 31st, to have a clear month-end cut-off and get the assets to their ultimate owners ASAP” In response, MTG advised CanWest that, as
“discussed earlier tonight, we should focus on two issues . . . The main issue for us now is to concentrate on the APA between us. Given the fact that we didn’t have the chance to go over it yet, we would prefer to read it over the weekend, ... I do agree that we should target to the end of the year, and I think we would still have enough time.”
On December 20, 2004, MTG advised CanWest of its availability for a conference call on December 22nd, and requested a *850 “step memo” that was prepared to “describe the structure of the deal[.] Until we know exactly what is the plan I am not sure that we can be very productive.” In response, CanWest confirmed the meeting and provided the “step memo.”
On December 22, 2004, CanWest wrote to MTG requesting, inter alla, that they discuss the mechanics of the asset purchase, partnership and general partnership agreements.
On December 27, 2004, CanWest advised MTG, inter alla, that “without [a final agreement] there is no partnership and we are increasingly frustrated . . . that you are not moving this along.”
By e-mail dated December 31, 2004, CanWest accused MTG of not returning calls, to which MTG responded on the same day that MTG was still" interested in bridging the existing “gaps” between the parties to “get the agreement signed.”
On January 3, 2005, CanWest advised MTG that it appeared that the parties had reached a “crisis stage” and that MTG was “clearly moving without us notwithstanding our agreement” and that if it did not hear from MTG by the following day, it “will assume [MTG does] not intend to honour our partnership, that [MTG] intend[s] to own and operate the Jerusalem Post without [CanWest].”
The next series of e-mails between the parties reflect Can-West’s lack of interest “in changing the deal, to 51-49 in favour of MTG.” CanWest contends that at the meetings in Tel Aviv on January 6th and 7th, MTG demanded that the share ownership of the new entity would be weighed in favor of MTG 75%-25% or 51%-49%. Alternatively, MTG insisted that it would accept 50/50 ownership only if substantial terms of the June agreement were changed in its favor. Further, MTG demanded that, instead of establishing a board of directors comprising seven directors, with four, including the chairman, appointed by Can-West, the agreement had to be changed to eliminate CanWest’s right to appoint a fourth director. All of the alternatives proposed by CanWest were flatly rejected.
Finally, by letter dated January 10, 2005, CanWest stated that based on MTG’s failure to discuss and complete the APA and shareholders agreements, and Mr. Azour’s rejection of the terms of the June agreement, MTG repudiated such agreement. Can-West expressed its willingness to proceed under the June agreement, and demanded that MTG confirm its willingness to proceed with the transaction as contemplated by the June agree *851 ment. In response, MTG stated that the demand was unreasonable and made in bad faith, and deemed CanWest’s letter “as a clear repudiation and bad faith breach of the agreements between the parties, and as a notice of termination of the parties’ negotiations and relationship.” CanWest thereafter advised MTG of its continued willingness to “honor the[ ] Agreement.” However, MTG stated outright that it was not willing to give any such assurances.
C. Initial Order to Show Cause and Temporary Restraining Order
Upon application by CanWest, the court temporarily enjoined MTG from taking certain actions with respect to the JPost Group (the first TRO). The TRO was subsequently lifted since service of the order to show cause (OSC) had not been completed pursuant to the Hague Convention.
II. Instant Order to Show Cause and Application for Temporary Restraining Order
Having effected proper service upon MTG, CanWest now moves by OSC for a TRO, enjoining MTG and its officers, including Eli Azour, and all persons acting on behalf of MTG, from taking certain actions with respect to the JPost Group.[1]
In support, CanWest contends that it has continued to suffer irreparable harm. According to CanWest, at the time the initial TRO was sought, MTG had already fired senior management executives at the Jerusalem Post, hired a new CEO and CFO, and appointed a new executive to manage the North American components of the JPost business. Further, MTG caused agreements instrumental to the operation of the publication to be amended.
CanWest claims that it recently learned that MTG purports to have transferred its shares in PPL to Eli Azour, the president and principal shareholder of MTG on December 15, 2004. At the same time, Mr. Azour claims to have purchased the Jerusalem Report Publications Limited from PPL. CanWest also *852 discovered that there has been a treasury issue of 12% of the PPL shares to Y.B. Etgarim Ltd. (YEL), a company solely owned by Jacob Bardugo, who was recently appointed as manager of PPL. It is argued that the irreparable injury CanWest has already suffered will only continue.
CanWest further avers that as the president and principal shareholder of MTG who signed the agreement on behalf of MTG, Mr. Azour had actual knowledge of paragraph 9 of the agreement, which provides for binding arbitration in New York of any dispute arising from or relating to the agreement.[2] Further, the arbitration commenced by CanWest and related proceedings in New York State court were widely publicized in the Israeli press, and CanWest’s assertion of its agreement with MTG and CanWest’s ownership rights were described in this press coverage. Additional press coverage of the agreement occurred as a result of a lawsuit commenced in Israel by Mr. Azour, in which he acknowledges both the existence of the agreement and CanWest’s assertion of ownership rights. Similarly, it is argued, Mr. Bardugo had actual knowledge of the agreement; the Israeli proceedings commenced by Mr. Azour put Mr. Bardugo on notice and created a duty to inquire before he proceeded with his purported acquisition of shares.
CanWest also contends that it is likely to succeed on the merits of its claim that MTG breached the agreements. In support, CanWest argues that up to the time of MTG’s acquisition of the JPost Group on December 15, 2004, the parties were proceeding consistent with the intent of the parties’ agreements, and in anticipation that MTG would consummate the agreements by, inter alla, transferring the JPost Group assets to an entity jointly owned by both parties.
CanWest avers that the November agreement does not give MTG any right to withdraw, other than on the basis of the June agreement, in which event, MTG would be prohibited from seeking ownership of the JPost Group for a period of 12 months. By repudiating the June agreement, MTG breached the parties’ agreement and unilaterally took over exclusive control, management and ownership of PPL and the JPost Group to the total exclusion of CanWest.
*853 Further, MTG’s offer to transfer the assets on the condition that CanWest give up its rights under the June 11 agreement “was not good faith negotiation” but extortion in order to seize the JPost Group for itself.
MTG’s Opposition and Cross Motion to Vacate the TRO
MTG opposes injunctive relief, and cross-moves to vacate the TRO, arguing that the court lacks jurisdiction to issue injunctive relief against MTG and that CanWest failed to meet its burden to justify such relief.
MTG argues that the pending arbitration between CanWest and MTG is an “international arbitration” governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the UN Convention) which restricts prearbitration judicial action to determinations as to whether an arbitration should be compelled. Relying on Cooper v Ateliers de la Motobecane (57 NY2d 408 [1982]) and its progeny, MTG argues that the UN Convention restricts prearbitration judicial action to determinations as to whether an arbitration should be compelled, and as such, this court lacks jurisdiction to entertain the instant application for injunctive relief.
Furthermore, it is argued that since case law holds that parties by consent cannot confer on federal courts subject matter jurisdiction beyond the limitations imposed by the United States Constitution, the limitation by a treaty herein on the court’s jurisdiction similarly cannot be undone by the parties.
In any event, MTG asserts, CanWest failed to make a clear showing of its entitlement to injunctive relief. MTG contends that at the time CanWest brought the instant application, it was advised that MTG transferred its interest in PPL to its principal shareholder, Mr. Azour, in December 2004. Therefore, any injunction to bar CanWest’s alleged joint venture partner, MTG, which owns neither the shares of PPL nor its underlying assets, is pointless and futile. It is equally ineffective to seek an injunction prohibiting MTG from directing the affairs of PPL.
Further, the TRO is overreaching as to any party other than MTG. CanWest’s attempt to add the three additional parties to the arbitration demand is “purely cosmetic,” as none of these individuals have signed an arbitration agreement, and nothing in the Federal Arbitration Act (FAA) requires them to do so. MTG adds that the UN Convention, which applies here, requires an “agreement in writing” between the parties to an interna *854 tional arbitration, which does not exist in respect to any of these parties. Since PPL has not entered into any agreement to arbitrate, there is no “arbitrable controversy” between Can-West and PPL, and, as such, no basis for seeking to extend the TRO to PPL, the “Jerusalem Post,” or any other “affiliates” of MTG. Noting that the TRO is addressed to MTG’s directors and officers, including Mr. Azour, MTG also contends that neither YEL nor Bardugo are parties to any “arbitrable controversy.” Mr. Azour was not a signatory to any arbitration agreement. And, CanWest’s assertion that Mr. Azour had notice of the arbitration agreement is insufficient to overcome the FAA’s proscription that the court cannot compel arbitration by any parties that are not already covered in an agreement.
Likewise, CanWest has no prospect of piercing the corporate veil in order to hold Mr. Azour personally responsible under the arbitration clause of the June agreement. It is argued that MTG has a separate corporate existence, is duly incorporated, and in good standing under the laws of Israel. Further, MTG conducts business in its own name and on its own behalf, holds property in its own name, and has corporate representatives other than Mr. Azour, including Eyal Golan. MTG also points out that Can-West repeatedly recognized MTG, not Mr. Azour, as its potential business partner, and never required Mr. Azour be made a party to the agreements or personally guaranty MTG’s performance. The transfer of shares to Mr. Azour was properly documented and reflected in the tax structure of the acquisition. Further, there was a bona fide commercial rationale for the transfer, the transfer was not prohibited by the November agreement, which does not address postacquisition ownership of PPL shares, and the transfer was made known to CanWest immediately thereafter.[3]
In addition, CanWest has not identified any irreparable harm warranting injunctive relief. Since the profitability of PPL and the Jerusalem Post was impaired by the first and current TRO, such injunction is actually destructive of the asset CanWest *855 seeks to covet. And, CanWest fails to explain what purpose is served by blocking PPL from becoming more profitable by disposing of redundant assets or restructuring its work force. Moreover, as PPL has already been sold by MTG, the sole remedy available to CanWest is damages, which negates any suggestion of immediate or irreparable harm. MTG also claims that, as an additional remedy, CanWest can litigate its right to any PPL stock in Mr. Azour’s proceeding to clear title to the shares in Jerusalem Post, pending in Israel.
MTG further contends that CanWest cannot establish the likelihood of success on the merits. At the outset, MTG maintains that CanWest’s contention that the June agreement gives it the right to maintain the status quo is without merit, given that the provision at issue merely gives the parties the ability to seek such relief in New York state court, and does not obviate the burden imposed by the CPLR to establish entitlement to injunctive relief.
Also, since the parties failed to agree upon the terms of a common venture to own the “Jerusalem Post,” CanWest cannot establish that MTG breached the agreements. The June agreement merely creates a framework to agree upon a joint bid, and does not obligate either party to make a joint bid for the “Jerusalem Post” or PPL; rather, it refers to a “Possible Acquisition” and requires that any “Bid,” once negotiated, be “subject to the unanimous decision of the Parties.” MTG points out that the completion and submission of the bid was subject to the five “conditions precedent” and that none of these conditions were ever satisfied. Further, although CanWest repeatedly cites to the draft “Shareholders Agreement” attached as schedule A to the June agreement, MTG and CanWest never actually entered into any such agreement and schedule A was superceded by the November 10 agreement.
According to MTG, after the June agreement was executed, it soon emerged that CanWest would not participate in any bid for PPL because it was unwilling to assume the liabilities of PPL and Hollinger was unwilling to enter into any representations or indemnities to cover those losses. CanWest agreed to permit MTG to bid alone for PPL, and that MTG and CanWest subsequently agreed to attempt to negotiate a joint venture structure to hold PPL’s assets, including the Jerusalem Post on the condition that (1) CanWest would only contribute to such venture once it was insulated from risks associated with PPL’s liabilities, and (2) unless and until a revised venture structure *856 was agreed upon, CanWest would not be financially liable to contribute to the acquisition of PPL. Therefore, the November agreement was entered into to supply even more opportunities for CanWest to retreat from a future deal.
In this regard, the November agreement evinces that the parties contemplated to “negotiate in good faith” to try to reach a mutually satisfactory agreement for a joint venture to own certain of PPL’s assets. The critical terms of the November 10 agreement, i.e., the nature and extent of “certain liabilities” to be assumed by MTG, were completely a matter for future negotiation. Thus, the November 10 agreement contained, at most, an obligation to negotiate until December 15 to form a future possible venture to own some of the assets of PPL, whose structure, liabilities, assets and other critical features were never actually agreed upon prior to the collapse of talks in January 2005.
Nevertheless, MTG still expected to agree on these matters with CanWest and therefore engaged in further discussions, from December 2004 through mid-January 2005, in an effort to reach agreement. But, the parties remained divided on many key issues. MTG points out that on December 27, 2004, Can-West acknowledged that unless the parties reached an agreement on the form and structure of the future venture to own the “Jerusalem Post” no such venture would or could be established. Although the negotiations occurred, they failed to result in any agreement. Therefore, CanWest has no partnership or any other ownership rights in MTG.
According to MTG, after Hollinger and MTG signed the purchase agreement obligating MTG to close the deal by December 23, 2004, MTG tried, but failed to negotiate with CanWest to finalize a venture structure, partnership and asset purchase agreement and to fulfill the other conditions precedent set forth in the November 10 agreement. MTG asserts that it notified CanWest that the closing was set for December 15, 2004. Although CanWest expressed reservations about an early closing, it accepted that a quick transition was necessary since PPL was losing money. In view of CanWest’s refusal to participate in the financing of the deal, MTG was forced to pay Hollinger the balance of the sum to which it had committed. Therefore, it is argued, the evidence shows that MTG did participate in negotiations up to the closing of the PPL acquisition, and that CanWest kept refusing to commit to or finance a deal, leaving MTG alone to purchase PPL. Since any obligation to *857 negotiate was fully discharged by MTG, CanWest still has no cognizable proprietary interest in PPL or the Jerusalem Post.
At the closing, MTG acquired, inter alla, all but one of the shares of PPL. Also on December 15, 2004, MTG transferred all of its PPL shares to Mr. Azour personally. Mr. Azour’s acquisition of PPL, and his direct acquisition from PPL of Jerusalem Report Publications Limited, reflected the tax structure of the acquisition and the fact that he had drawn on his own credit to finance the purchase of PPL. MTG communicated the transfer to Mr. Azour to CanWest, which did not object.
According to MTG, during negotiations in Tel Aviv on January 6 and 7, 2005, it seemed the parties had reached an agreement on a venture structure: (1) PPL’s core business assets would be transferred to a MTG/CanWest joint venture vehicle, (2) MTG (or Mr. Azour) would retain PPL’s redundant assets and assume certain categories of outstanding PPL liabilities, and (3) the price to CanWest for its investment would be adjusted to United States $5 million for 50% of the business to reflect the netting of assets being retained and liabilities being assumed by MTG or Mr. Azour. However, CanWest then vetoed this agreement in favor of a “take it or leave it” proposal, accompanied by threats that CanWest would create a “black hole” litigation for MTG in New York, and establish a rival to drive the Jerusalem Post out of business. CanWest insisted on (1) a 3-3 board, with a neutral chair, (2) that it have editorial control over the Jerusalem Post, and (3) that all assets and liabilities of PPL be assigned to the new venture and shared on a 50-50 basis by both parties. MTG took issue with CanWest’s proposal because CanWest sought the right (in consultation with MTG) to control the method of operation of the editorial board and not the right to determine editorial content as provided in the shareholders agreement. MTG believed that CanWest would then turn the Jerusalem Post into an extreme right-wing newspaper. When MTG proposed that discussions resume after the approaching Sabbath, CanWest allegedly left the country.
On the following Sunday, MTG attempted to contact CanWest to resume discussion. However, on the following Monday, Can-West retreated to a new proposal different from either of those discussed on January 7; CanWest abandoned negotiations, and insisted that the parties immediately establish a jointly-held company pursuant to the “long-defunct” skeletal draft shareholders agreement, ignoring the conditions precedent to the June and November agreements, and requiring MTG to forego *858 its right to withhold acceptance of proposals with which it agreed. On February 15, 2005, PPL finalized agreements with YEL in order for PPL for financing to meet its cash flow needs; YEL subscribed for 137 newly-created shares in PPL and PPL received a loan of $1.6 million.
According to MTG, it negotiated in good faith at all times and only ceased negotiations with CanWest once it became evident that no agreement would ever be reached.
In further opposition to injunctive relief, MTG argues that the balance of equities militates against the continuance of a TRO. The first TRO already caused significant harm to MTG and PPL in lost business, lost advertising, workplace disruption and loss of the ability to raise bank finance, and the requested relief would severely jeopardize the Jerusalem Post.
It is further argued that CanWest’s application is barred by the doctrine of loches and unclean hands. CanWest allegedly failed to address its knowledge of the transfer to Mr. Azour in its earlier OSC papers. And, even accepting CanWest’s assertion that it recently learned of such transfer on February 11, 2005, CanWest did not bring this application until 24 days thereafter.
MTG also claims that the potential hardship to MTG tips the scale against injunctive relief. Any bar on MTG from entering into any contracts effectively puts MTG out of business altogether, and causes reputational damage to MTG and Mr. Azour. MTG states that any TRO will prevent the sale of loss factors within PPL, i.e., the printing press, and harm PPL’s goodwill and workplace relations. Also, the TRO presents a direct challenge to the competence of the Jerusalem District Court to hear and determine claims involving Mr. Azour, Can-West, and PPL because the relief contained in the TRO implicates issues before that court.
In response to MTG’s cross motion to vacate the TRO, Can-West asserts that the parties chose a New York court, not arbitration, as the forum for preliminary injunctive relief. The UN Convention does not apply to every dispute involving foreigners in New York, but only disputes that the parties have agreed to submit to arbitration and then only to the extent the dispute is within the scope of the arbitration agreement. Here, the parties did not agree to arbitration as the forum for preliminary injunctive relief; instead, they agreed that the claim for injunctive relief may be heard in a New York court.
CanWest also asserts that Cooper requires enforcement of the parties’ agreements, including the provision authorizing injunc *859 tive relief from a New York court. Further, this court has jurisdiction to issue injunctive relief because the parties’ choice of New York courts as the forum for same is enforceable under General Obligations Law § 5-1402. It is clear that, as a matter of law, respondents have submitted to the jurisdiction of New York courts by agreeing that applications for injunctive relief may be made to a New York court.
Additionally, CanWest has demonstrated a strong likelihood of success on the merits that MTG has breached the agreements and that the TRO properly applies to Mr. Azour. MTG completed the acquisition on its own, thereby breaching paragraph 7 of the June agreement, and in January, refused to negotiate in good faith by insisting on an entirely different deal. CanWest also argues that MTG’s assertion that it notified CanWest of the transfer to Mr. Azour, which CanWest expressly denies, is unsupported by any documentary evidence. CanWest contends that the documents concerning this purported transfer demonstrate that MTG’s transfer of the shares to Mr. Azour before the closing of the transaction with Hollinger was done when respondents were supposed to be negotiating in good faith with CanWest. The minutes of a Mirkaei Tikshoret Limited (MTL) board meeting six days before the closing with Hollinger purportedly approving the sale of all shares to Mr. Azour personally contain only Mr. Azour’s name and confirm that the purported transfer was not an “arm’s length transaction” but a mere shifting of the names from MTG to Azour.
CanWest also asserts that MTG is not listed in Israel’s Company Registry, and as such, it is not a legal entity incorporated in Israel. Thus, there is no legal distinction between Mr. Azour and MTG. Since an individual is personally bound when he purports to sign on behalf of any entity that does not have a separate legal existence, and Mr. Azour is bound by the obligation to arbitrate and defend against an application for injunctive relief. CanWest also notes that it is puzzling how MTG could have continued to negotiate with CanWest after the shares of PPL had already been transferred to Mr. Azour. Further, where the parties agreed to arbitration, the issue of whether the agreement applied to a nonsignatory is to be determined by the arbitrator.
Furthermore, CanWest has demonstrated that severe irreparable harm and the balance of equities are in favor of injunctive relief. The loss of key employees constitutes irreparable harm as a matter of law. Also, respondents are engaged in self-dealing *860 and a fundamental restructuring of business relationships with irreversible consequences, including shutting down the printing plant and transferring the printing business to a company owned by Azour. Independent advertising has declined, and much of the advertising in the Jerusalem Post now promotes business run by Azour. The resulting erosion of the newspaper’s goodwill and reputation also constitutes irreparable harm as a matter of law. Every day that CanWest is denied its right to participate in the ownership and management of the newspaper also constitutes irreparable harm.
III. Analysis
A. United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards
The underlying arbitration agreement implicates the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The UN Convention was drafted in New York in 1958 in order to ease “the difficulty in enforcing international arbitration agreements by minimizing uncertainties and shifting the burden of proof to the party opposing enforcement” of such agreements (Cooper v Ateliers de la Motobecane, 57 NY2d 408, 412 [1982]). As such, the UN Convention provides that when an action is brought in court and a party asserts the arbitration agreement, the court “shall . . . refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed” (Foreign Arbitral Awards Convention, 21 UST 2517, TIAS No. 6997, art II, § 3).[4]
The UN Convention sets forth basic requirements for enforcement of arbitration agreements under the Convention: (1) there is a written agreement (Convention, art II [1], [2]), (2) the agreement provides for arbitration in the territory of a signatory to *861 the UN Convention (Convention, art I, §§ 1, 3), and (3) the subject matter is commercial (Convention, art I, § 3; Burnham v Ruebsamen, 139 AD2d 323 [1st Dept 1988]; see Smith/Enron Cogeneration Ltd. Partnership, Inc. v Smith Cogeneration Intl., Inc., 198 F3d 88, 92 [2d Cir 1999], citing Ledee v Ceramiche Ragno, 684 F2d 184, 186-187 [1st Cir 1982]).[5]
In the instant matter, the underlying arbitration agreement meets all of the above requirements. The underlying arbitration involves parties from Canada and Israel and pertains to an agreement to purchase assets in Israel. Furthermore, the agreement to arbitrate provides for arbitration in New York, New York (June agreement para 9) and the United States is a signatory to the UN Convention. There is no question that the underlying transaction for the purchase of and subsequent transfer of shares in, inter alla, PPL is commercial. Therefore, the agreements at issue between CanWest and MTG satisfy these requirements and are subject to the UN Convention enforcement rules.
B. Cooper and Its Progeny
MTG argues that the Court of Appeals decision in Cooper v Ateliers de la Motobecane (57 NY2d 408 [1982]) proscribes prearbitration injunctive relief in matters governed by the UN Convention. In Cooper, the Court of Appeals opined that the purpose of the UN Convention to “minimize the uncertainty of enforcing arbitration agreements and to avoid the vagaries of foreign law for international traders” would be defeated if, “contrary to contract,” parties were permitted to petition a court for *862 prearbitration injunctive relief (Cooper, 57 NY2d at 410). Therefore, since the underlying dispute between the parties involved their obligations under an agreement which provided that disputes were to be resolved by arbitration in Switzerland, the order of attachment was improper.
After the Court of Appeals decision in Cooper, the Legislature enacted CPLR 7502 (c) to address prearbitration injunctive remedies. CPLR 7502 (c) confers authority upon New York State courts to “entertain an application for an order of attachment or for a preliminary injunction in connection with an arbitrable controversy.” Although the language of CPLR 7502 (c) appears to eviscerate Cooper, the First Department relied favorably on Cooper when it denied attachment pursuant to CPLR 7502 in connection with an arbitration within the purview of the UN Convention in Drexel Burnham Lambert Inc. v Ruebsamen (139 AD2d 323 [1st Dept 1988]).
In Drexel, the petitioner sought a prearbitration order of attachment pursuant to CPLR 7502 (c). The parties agreed that the dispute between them would be resolved in arbitration. Further, the agreement to arbitrate provided for arbitration in either West Germany, Belgium or the United States. The First Department reaffirmed its previously held position that
“in instances in which the UN Convention is applicable, the ‘arbitration is governed by the UN Convention, and pursuant to the terms thereof, . . . prejudgment attachment is prohibited. It was the intention of the UN Convention that there should be no significant judicial intervention until after an arbitration award is made’ ” (Drexel, 139 AD2d at 330, citing Shah v Eastern Silk Indus., 112 AD2d 870, 871 [1985] [holding that since the parties selected arbitration in India as the forum in which to resolve “any dispute of claims arising out of” their agreements, the UN Convention applied so as to preclude prejudgment attachment]).
The Court concluded that each of the three requirements for activating the UN Convention were present. Therefore, notwithstanding petitioners’ showing of entitlement to an order of attachment under CPLR 7502 (c), the Court held that Cooper rendered prearbitration attachment unavailable to the petitioners therein.
Similarly, in ContiChem LPG v Parsons Shipping Co. (229 F3d 426 [2d Cir 2000]), the Second Circuit Court of Appeals also limited prearbitration attachment under CPLR 7502 to do *863 mestic arbitrations. ContiChem attempted to obtain security in New York for damages resulting from a breach of a “charter party.” The issue before the court was whether ContiChem could avail itself of CPLR 7502 when no arbitration was pending in New York where the parties expressly agreed to arbitration in London. The court examined the Advisory Committee’s comment on CPLR 7502 (c) which states that:
“[T]here is no inconsistency between the proposed amendment [7502 (c)] and the decision of the Court of Appeals in Cooper v At[e]liers De La Motobecane, S.A., 57 NY2d 408, 456 NYS2d 728, 442 NE2d 1239 (1982), where a pre-arbitration attachment was disallowed in a matter involving international litigants governed by the [UN Convention], The amendment would not affect proceedings governed by such international agreements [i.e., the Convention].” (ContiChem, 229 F3d at 432, quoting 1985 Report of Advisory Comm on Civ Prac, reprinted in 1985 McKinney’s Session Laws of NY, at 3432.)
The ContiChem court also noted that the Advisory Committee explicitly contemplated that CPLR 7502 (c) was “designed to make the domestic arbitration remedy more efficacious” (id. at 432 [emphasis added]). Therefore, it held that although the matter involved maritime attachment, and Cooper was not necessarily a bar to relief, ContiChem nevertheless was not entitled to provisional remedies under CPLR 7502 (c) “because this [was] not a domestic arbitration” (id. at 433). Continuing, the court stated (at 433): “The charter party in this case specifically provided for arbitration of disputes in London, and Rule 7502 by its terms applies only to domestic arbitrations.” Therefore, the court refused to expand the scope of CPLR 7502 beyond the limits of its language. The court also noted (at 433) that having determined that ContiChem could not bring an application under CPLR 7502 “because it agreed to arbitration in London,” it cannot seek attachment under CPLR 6210,[6] “because the court cannot entertain” the CPLR 7502 application. In other words, since CPLR 7502 is limited to domestic arbitrations, and the parties in ContiChem explicitly agreed to arbitration in London, CPLR 7502’s provisional remedies were not available.
*864 C. Classification as a Domestic or International Arbitration
The court notes that in ContiChem, the Second Circuit equated a foreign situs of arbitration with a nondomestic arbitration, and outside the scope of CPLR 7502 relief. However, the court therein also stated (229 F3d at 432): “[I]f this case involved a domestic arbitration, not governed by the Convention, we would have little trouble concluding that Rule 7502 (c) was available to ContiChem . . . .” It is unclear whether the court, by this latter statement, equated domestic arbitrations to one not subject to the UN Convention. However, the case law does support the conclusion that a foreign arbitration for purposes of invoking CPLR 7502 relief is one whose situs is expressly selected as a country outside of the United States (see Smith/Enron Cogeneration Ltd. Partnership, Inc., 198 F3d 88, 94 [2d Cir 1999] [the “focus of . . . the Convention is not on the nationality of the party seeking to enforce an award but on the situs of the arbitration”]). In this regard, the agreements to arbitrate found in Cooper, Shah and ContiChem expressly provided for arbitrations in Switzerland, India and London, respectively. Similarly, the arbitration in Drexel was scheduled to be held in Germany, pursuant to the parties’ agreement to hold arbitrations in either West Germany, Belgium or the United States. Given that the parties herein expressly agreed to hold the arbitration solely in New York, the underlying domestic arbitration renders the instant matter materially distinguishable from Cooper and its progeny.
MTG confuses an international “agreement” with an international “arbitration.” While the agreements between the parties are undoubtedly international in nature, the terms of their agreements provide for a domestic arbitration. In paragraph 9 of the June agreement, the parties agree to a New York choice of law provision, arbitration in New York to be administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules, and to designate a member of the New York bar as the arbitrator. All of these factors are indicia of the intent of the parties to conduct a New York “domestic” arbitration. Accordingly, and contrary to MTG’s contention, that the agreements at issue satisfy the three requirements so as to implicate the UN Convention enforcement rules (supra at 860-861), Cooper and its progeny are no bar to the preinjunctive relief sought herein.
Moreover, unlike the facts in Cooper and its progeny, the parties herein specifically agreed, to permit an application “to any *865 court in the State of New York to seek injunctive relief to maintain the status quo until the arbitration award is rendered or the controversy is otherwise resolved” (June agreement para 9). CanWest and MTG clearly anticipated the possibility of prearbitration applications for injunctive relief in the event of a dispute, and unambiguously agreed to permit prearbitration judicial intervention for the purposes of obtaining such relief.
Before a party can be forced to forgo its rights to judicial review and submit its disputes to arbitration, there must be evidence that the parties intended to submit the relevant dispute to arbitration (see Matter of Writers Guild of Am. E. [Prockter Prods.], 1 NY2d 305 [1956]; Bowmer v Bowmer, 50 NY2d 288 [1980]; Matter of Helmsley [Wien], 173 AD2d 280 [1st Dept 1991]; see also 21 UST 2517, art II, para 1). In HSBC Bank USA v National Equity Corp. (279 AD2d 251, 252 [1st Dept 2001] [although not involving the UN Convention]), the parties’ agreement gave the lender, HSBC, the right, “at any time prior to the commencement of a judicial proceeding, to submit any disputes to arbitration, but by so electing the lender is not thereby required to submit all disputes to arbitration.” The agreement further provided that “no provision, nor exercise of rights under,. . . shall limit the right of any party ... to obtain from a court . . . provisional . . . remedies . ...” In response to HSBC’s request for an order of seizure, the defendant argued that the agreement could not confer such a provisional remedy by right since it was not authorized by statute, namely, CPLR 7502 (c), which only provided for an injunction or an order of attachment. The First Department rejected defendant’s contention, and held (at 254) that HSBC was free, “under the contract, and within the statute” to seek judicial relief while, simultaneously, seeking arbitration of the underlying dispute. Here, the parties specifically excluded any application for injunctive relief from the arbitration, and agreed to submit such applications to a New York court. The parties did not thereby attempt to contract out of the UN Convention; rather, they intentionally excluded injunctive relief from their arbitration agreement. Therefore, CanWest is similarly free under its contract to seek the injunctive relief herein.
This conclusion is not inconsistent with the UN Convention. The UN Convention recognizes that parties have the right to agree to resolve certain disputes outside of arbitration. Indeed, article V of the UN Convention provides bases on which a signatory may refuse to recognize or enforce an arbitral award. Subparagraph (c) of paragraph (1) permits refusal if:
*866 “The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced.” (21 UST 2517, art V, para [1] [c].)
Such a provision would be unnecessary if all agreements to submit disputes to arbitration required that any dispute between the parties be so submitted. This provision clearly recognizes that disputes may fall outside the scope of the agreement to arbitrate.
Furthermore, as noted in the Court of Appeals decision in Cooper, the UN Convention’s purpose is to provide parties with certainty when entering into an international contract (Cooper, 57 NY2d 408 [1982]). When, as here, parties agree to permit application to a court for prearbitration injunctive relief, it would be consistent with the letter and spirit of Cooper and its progeny to enforce that agreement. Additionally, the provision in the June agreement which permits applications to New York courts for injunctive relief is separate and distinct from the provision in the June agreement which permits arbitration, and therefore does not fall within the purview of, and is not inconsistent with, the UN Convention. Therefore, there is no basis to preclude parties to an international agreement from enforcing an agreement to seek the same remedies that CPLR 7502 (c) provides to domestic arbitrations. The injunctive relief carve-out, contractually agreed upon by the parties herein, does not frustrate the purpose of the UN Convention, but supports the goal of “minimiz[ing] the uncertainty of enforcing arbitration agreements and to avoid the vagaries of foreign law for international traders.” (Cooper, 57 NY2d at 410.) The “international traders” herein avoided any uncertainty in the enforcement of arbitral awards arising from their agreement by expressly providing a mechanism to seek injunctive relief in connection with any arbitration. It cannot be said that the purpose of the UN Convention is defeated, because the application herein for injunctive relief is not “contrary to contract.”
The court also notes that since the parties’ agreement provides that an application for injunctive relief may be made in any New York court, General Obligations Law § 5-1402 further *867 supports the enforcement of such an agreement. General Obligations Law § 5-1402 provides, in part:
“1. Notwithstanding any act which limits or affects the right of a person to maintain an action or proceeding, . . . any person may maintain an action or proceeding against a foreign corporation, nonresident, or foreign state where the action or proceeding arises out of or relates to any contract, agreement or undertaking for which a choice of New York law has been made in whole or in part pursuant to section 5-1401 and which (a) is a contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state.”
In the instant case, since the June agreement includes a choice of New York law and the parties’ submission to the jurisdiction of New York courts for injunctive relief, and relates to an obligation of more than $1 million, New York is the proper forum as a matter of law to entertain the injunctive application (CPLR 327 [b]; General Obligations Law § 5-1402; National Union Fire Ins. Co. of Pittsburgh, Pa. v Worley, 257 AD2d 228, 230-231 [1st Dept 1999]).
Accordingly, based on the terms of the June agreement between CanWest and MTG, this court concludes that CanWest’s application for injunctive relief pursuant to CPLR 7502 (c) in connection with the underlying arbitration is not barred by either the UN Convention or Cooper or its progeny. And, General Obligations Law § 5-1402 permits CanWest to seek such relief.
D. Injunctive Relief
While ordinarily the function of a preliminary injunction is to preserve the status quo until a final determination upon the merits can be made, “[t]here is no question that in a proper case the Supreme Court has power as a court of equity to grant a temporary injunction which mandates specific conduct” (McCain v Koch, 70 NY2d 109, 116 [1987]; see also, State of New York v Solil Mgt. Corp., 128 Misc 2d 767 [Sup Ct, NY County 1985] [an injunction may be used to either restrain or compel performance of an act]). The decision whether to grant a motion for preliminary relief is committed to the sound discretion of *868 the trial court (see, Doe v Axelrod, 73 NY2d 748, 750 [1988]; Jiggetts v Perales, 202 AD2d 341, 342 [1st Dept 1994]).
In order for a preliminary injunction or temporary restraining order to be issued pursuant to CPLR 7502 (c), the petitioner must demonstrate (1) a likelihood of success on the merits; (2) irreparable injury absent the granting of the preliminary injunction; (3) a balancing of the equities which favors the issuance of injunctive relief; and (4) that “the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief’ (50-09 2nd St. LLC v Ianvil Assoc., Inc. 2002 NY Slip Op 50292[U], *4 [Sup Ct, NY County 2002]; St. Paul Fire & Mar. Ins. Co. v York Claims Serv., 308 AD2d 347 [1st Dept 2003]; New York City Off-Track Betting Corp. v New York Racing Assn., 250 AD2d 437 [1st Dept 1998]; Grumet v Cuomo, 162 Misc 2d 913 [Sup Ct, NY County 1994]). Preliminary injunctive relief is a drastic remedy, which will only be granted if it is established that there is a clear right to the relief under the law and the facts (Koultukis v Phillips, 285 AD2d 433 [1st Dept 2001]).
In addition, where as here the injunctive relief would upset the status quo and grant some form of the ultimate relief requested, the movant has the heightened burden of showing that extraordinary circumstances warrant the relief (see Rosa Hair Stylists v Jaber Food Corp., 218 AD2d 793, 794 [2d Dept 1995]).
Notwithstanding, CPLR 6314 permits the court to vacate or modify a temporary restraining order or preliminary injunction where such injunctive relief would not serve any of the objectives the remedy is designed to achieve, where the party in support is not in danger of suffering any irreparable injury during the pendency of the suit or an alternative legal remedy is adequate to protect the interests of the party in support of injunctive relief. Further, a temporary restraining order or preliminary injunction may be vacated due to the lack of jurisdiction over the person to be retrained.
1. Likelihood of Success on the Merits
CanWest has demonstrated a strong likelihood of success on the merits of its claim that MTG breached the June and November agreements. The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties’ intent (see Slatt v Slatt, 64 NY2d 966, 967 [1985], rearg denied 65 NY2d 785 [1985]). “The best evidence of what parties to a written agreement intend is what they say *869 in their writing” (Slamow v Del Col, 79 NY2d 1016, 1018 [1992]). Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms (see e.g. R/S Assoc. v New York Job Dev. Auth., 98 NY2d 29, 32 [2002], rearg denied 98 NY2d 693 [2002]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]).
The June agreement was expressly intended to be a legally enforceable agreement between CanWest and MTG. By its terms, the June agreement was a proposal to establish, upon agreed material terms, a newly formed entity or partnership, which would acquire the assets of JPost Group from Hollinger. Such agreements to negotiate in good faith in an effort to reach a final agreement within a certain scope of terms are enforceable (see Teachers Ins. & Annuity Assn. of Am. v Tribune Co., 670 F Supp 491 [SD NY 1987]). The parties expressly indicated that they would be “equal 50/50” shareholders in this newly formed entity. CanWest and MTG also agreed to develop a business plan and finalize a bid to be accepted by Hollinger. The submission of the bid was subject to certain conditions precedent, including completing the final structure of the newly formed entity and successfully executing a shareholders agreement pursuant to Schedule A of the agreement. The June agreement also permitted either party to withdraw from submitting the bid or, if permitted by the bid, to determine not to proceed with the purchase of the JPost Group assets, if such party determined in its own judgment that the conditions precedent will not be capable of being fulfilled to its satisfaction. Under such circumstance, the party that withdrew from submitting the bid or proceeding with the acquisition was expressly prohibited from proceeding alone or with any third party relating to the acquisition for a period of 12 months after withdrawal.
However, the June agreement was modified in part by the November agreement. The November agreement expressly acknowledged MTG’s submission to Hollinger of the offer to purchase the JPost Group assets, and that such submission was with the concurrence of CanWest. More importantly, the November agreement bound the parties to negotiate in good faith to finalize, before the closing of the Hollinger transaction, the terms under which MTG shall sell the assets of PPL and its subsidiaries to the newly formed entity, which will be owned and funded by CanWest and MTG equally (50%), and on the basis that MTG will indemnify and hold the newly formed entity harmless in respect to certain liabilities of the PPL. The *870 November agreement also obligated MTG and CanWest to negotiate in good faith to finalize, before the closing of the Hollinger transaction, the terms of the agreements and conditions precedent outlined in the June agreement, recognizing that the parties have outlined the terms of the shareholders agreement to be applicable to the newly formed entity to be jointly owned by them. More importantly, the November agreement provided that in the event the parties are unable to negotiate in good faith toward finalizing the terms by which MTG shall sell the JPost Groups assets to a newly formed entity, or complete the conditions precedent outlined in the June agreement, CanWest would have no further obligation to participate in the purchase of the PPL.
In essence, the June and November agreements clearly represent an agreement between CanWest and MTG to submit a joint bid for the purchase of the JPost Group’s assets from Hollinger, and to work together in creating the newly formed company, to which the assets of the JPost Group would be transferred after the closing of the purchase from Hollinger. The parties agreed to work toward creating the newly formed entity before the closing of the Hollinger transaction, but in the event the newly formed entity was not created by such time and MTG nevertheless completed the transaction, CanWest was no longer obligated to participate in the formation of the newly formed entity or purchase of the PPL in any manner.
Omitted from the November agreement is any reference to MTG’s obligation in the event MTG completed the Hollinger transaction, and the newly formed entity was not created by the time of the closing of the Hollinger transaction. However, it appears that from a fair reading of the November agreement, together with the June agreement, MTG had a continuing obligation to negotiate toward structuring the newly formed entity to receive the shares of PPL and to finalize the terms of the relevant agreements until either party served notice of its decision to withdraw from purchasing the JPost Group, since, pursuant to the November agreement, “all other respects” of the June agreement “continued in force and effect.”
Contrary to MTG’s contention, the obligation to negotiate in good faith to finalize, “on or before the closing date,” served as a goal to work toward structuring and finalizing the limited partnership to which MTG was to transfer the shares of PPL, and does not express the moment at which the parties’ obligation to negotiate in good faith ended.
*871 The submissions herein sufficiently demonstrate, for purposes of injunctive relief inquiry, that MTG breached its duty to negotiate in good faith by drastically altering the terms of the June and November agreements. The submissions indicate that MTG insisted on terms, i.e., 75%-25% in favor of MTG, that were in direct conflict with those contained in the June and November agreements. The obligation of good faith requires parties to refrain bars a party from insisting on terms that do not conform to the preliminary agreement (Teachers, supra; Liberty Envtl. Sys., Inc. v County of Westchester, 2000 WL 1752927, at *4, 2000 US Dist LEXIS 17095, *12 [SD NY 2000]). Notably, the record indicates that as of December 15, 2004, MTG negotiated with what it knew to be assets owned by Mr. Azour, who, according to MTG, is not subject to either agreement and, thus, not within this court’s jurisdiction. Any measure of good faith with which MTG purports to have negotiated is undermined by the position taken by MTG that Mr. Azour was not obligated to abide by the June agreement. Therefore, assuming the veracity of MTG’s position, that Mr. Azour is not a party to the June agreement, MTG could not have been in a position to negotiate toward the sale of “Mr. Azour’s” assets to a newly formed corporation pursuant to the terms of the June and November agreements.
CanWest argues that it is likely to succeed on the merits against Mr. Azour in an individual capacity because MTG does not have a separate legal existence. Since Mr. Azour signed the June and November agreements on behalf of MTG, an entity without a separate legal existence, CanWest claims that Mr. Azour is personally bound.
An action may be maintained against the president of an unincorporated corporation in his individual capacity. Defendant in Refined Sugars Inc. v Hazou (1987 WL 19024, 1987 US Dist LEXIS 9662 [SD NY 1987]) contracted with plaintiff under the name of an unincorporated entity named American Sahara General Trading Company (GTC). Defendant, Hazou, sought to dismiss the breach of contract claims against him in an individual capacity claiming that he conducted business with plaintiff as president of American Sahara, Inc. However, plaintiffs presented a contract which Hazou signed as president on behalf of GTC. The court denied defendant’s motion to dismiss, stating that “[t]he fact that he signed it ‘Elias Hazou, President’ does not by itself transform the General Trading Company into a corporation” (1987 WL 19024, *3, 1987 US Dist LEXIS 9662, *9).
*872 Similarly, MTG has established its likelihood of success on the merits of its breach of agreement claim against Mr. Azour. In the instant case, Mr. Azour signed the June agreement on behalf of MTG. CanWest contends that MTG is a nonexistent entity. Although MTG now claims that it was and is the trade name for MTL, there is no indication in the June or November agreement that MTG was doing business as MTL. Furthermore, the June agreement fails to even mention that MTL has any interest in the subject matter. Since Mr. Azour signed the June agreement on behalf of MTG, a nonexistent entity, this court finds that CanWest has demonstrated its likelihood of success on the merits of asserting it breach of contract claims as against Mr. Azour individually.
2. Irreparable Harm
CanWest has also established a sufficient basis for finding irreparable harm in the event that the relief is not granted. Since the closing with Hollinger, MTG and/or Azour have (1) fired key executives and employees, (2) moved printing operations, (3) reduced advertising, and (4) changed printing suppliers, resulting in the loss of customers, revenue and an erosion of its reputation. Furthermore, CanWest has lost the right to participate in the management of the Jerusalem Post. These factors necessitate a finding of irreparable harm (see Urban Archaeology Ltd. v Dencorp Invs., Inc., 12 AD3d 96 [1st Dept 2004] [finding the loss of important employees to be irreparable injury]; Register-.Com, Inc. v Verio, Inc., 356 F3d 393 [2d Cir 2004] [holding that the loss of reputation, goodwill and business opportunities constitutes irreparable harm]; Willis of N.Y. v DeFelice, 299 AD2d 240 [1st Dept 2002] [finding that the loss of business was irreparable damage]; Wisdom Import Sales Co., L.L.C. v Labatt Brewing Co., Ltd., 339 F3d 101 [2d Cir 2003] [holding that the loss of the right to participate in management constituted irreparable harm where such right was essential to preserving an agreed-upon balance of power in management]).
3. Balance of the Equities
Furthermore, since CanWest merely seeks to maintain the status quo, the balance of equities tilt in its favor. Absent a TRO, MTG will be free to take additional actions which may cause CanWest further irreparable injury (see Gramercy Co. v Benenson, 223 AD2d 497 [1st Dept 1996] [finding that the balance of equities tilted in favor of plaintiffs who merely sought to maintain the status quo where denial of injunctive relief would have rendered the final judgment ineffectual]).
*873 4. Award Rendered Ineffectual
Finally, absent a temporary restraining order, MTG and/or Mr. Azour will be able to transfer the shares of PPL prior to the hearing on the preliminary injunction. Such a transfer would render a preliminary injunction ineffectual since it would only constrain MTG and not the new owners of PPL.
IV Conclusion
Based on the foregoing, it is hereby ordered that CanWest’s order to show cause for a temporary restraining order, pending a hearing of CanWest’s petition for a preliminary injunction, enjoining MTG and its subsidiaries, affiliates, and officers, including Eli Azour, and all persons acting on behalf of MTG from taking certain actions with respect to the JPost Group is granted; and it is further ordered that the cross motion by MTG to vacate the temporary restraining order is denied.

. Specifically, CanWest seeks to enjoin MTG from, inter alia: (1) entering into any merger, consolidation, joint venture or adopting or effecting any reorganization of any kind involving the JPost Group, (2) taking any steps to terminate the corporate existence of any entity comprising the JPost Group, (3) selling, transferring, or encumbering any of the shares or other securities, or JPost Group assets acquired by MTG, (4) repaying to MTG any indebtedness, (5) changing the employment status of any executives of any entity comprising the JPost Group, and (6) terminating or entering into any contracts or business relationships.

. CanWest contends that the agreement further provides that either party “may apply to any court in the State of New York to seek injunctive relief to maintain the status quo until the arbitration award is rendered or the controversy is otherwise resolved.” Pursuant to these provisions, CanWest commenced an arbitration with the American Arbitration Association in New York.

. MTG asserts that, prior to the closing, it kept CanWest apprised of PPL’s serious financial condition, and that, based on CanWest’s reactions, MTG became concerned with its ability to respond to such problems. Mr. Azour took “quick action to stop the bleeding” and appointed a new CEO and CFO to take over management. At the time of these hiring and firing decisions, Mr. Azour held close to 100% of PPL’s share capital, having financed the PPL acquisition out of his own personal credit and was therefore not required to gain CanWest’s consent. The appointment of the CFO and the firings of the head of marketing and the publisher were approved by CanWest.

. Article II provides:
“1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration . . .
“3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.”

. Smith and Ledee, to which the court in Smith cites, adds an additional requirement: that the agreement is not entirely domestic in scope. While citing to the UN Convention in support of the three aforementioned criteria, the Ledee court cites solely to the Federal Arbitration Act (9 USC § 202) in support of the fourth requirement. 9 USC § 201 provides that the UN Convention “shall be enforced in United States courts in accordance with this chapter.” USC § 202 defines the type of “Agreement or award falling under the Convention”:
“An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement . . . An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.”

. CPLR 6210 permits the court, upon motion on notice, to grant a temporary restraining order prohibiting the transfer of assets by a garnishee as provided in CPLR 6214 (b). A garnishee is defined in CPLR 105 (i) as “a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest.”